No. 90,709

STATE OF KANSAS, *Appellee,* v. VERNON D. HARRIS, III, *Appellant.*

105 P.3d 1258

Opinion filed February 18, 2005.

*Nathan B. Webb*, assistant appellate defender, argued the cause and was on the brief for appellant.

*Kristi L. Barton*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

GERNON, J.: Vernon D. Harris, III, appeals his conviction for first-degree felony murder, claiming that his confession was involuntary, the prosecutor improperly commented on his decision not to testify, the trial court allowed improper hearsay evidence, and the trial court should have granted his motion for a new trial based on newly discovered evidence.

Police found Bennie Zeigler's body lying in the street at approximately 11:48 a.m. on December 31, 2001. Zeigler had died from a gunshot wound to the head. Patricia Shelinbarger, a neighborhood resident, witnessed the shooting and notified police.

Immediately prior to the shooting, two black men and a woman approached Shelinbarger's house and knocked on her door. Shelinbarger observed the people at the door through her window. Shelinbarger was acquainted with the woman, Lana Jackson, so she sent her daughter to answer the door. After the three people spoke with Shelinbarger's daughter for 3 or 4 minutes, they left Shelinbarger's front door and returned to a car parked along the curb. A couple of minutes later, a fight broke out between the two men in the street while Jackson watched from the grass near the curb. Shelinbarger was concerned about her dog in the front yard, so she decided to bring him in. As she was opening the door, she heard two gunshots and saw Jackson run around to the driver's side of the car. One of the men pushed Jackson into the front seat before getting into the back seat, and the two sped away; the other man was left lying in the street.

Initially, Shelinbarger and her daughter identified the shooter as Terence Harvell, a man they had met the night before at a party. However, the police interviewed Harvell and concluded that he had a valid alibi for the time of the shooting.

Jackson told police that Harris shot Zeigler while trying to rob him during a drug sale. Harris was arrested and, after being advised of his *Miranda* rights, agreed to talk to Detective Chisholm and

his partner. Harris initially told police that he was not present during the shooting incident but later told several different stories about what happened. Ultimately, Harris told Detective Chisholm that he had gone with Jackson and another man named Eric Donaldson to watch his friends' backs during a drug deal. Harris claimed that Donaldson was the shooter.

Relying on Harris' confession, the State prosecuted Harris for one count of felony murder on the theory that Zeigler was killed during the course of a drug sale. Harris defended himself by trying to demonstrate that he could not have been at the scene of the crime. Harris had been living at Mirror, Incorporated (Mirror), a correctional facility in northern Wichita that allowed residents privileges for working or visiting family offsite. According to Mirror's sign-out log, Harris signed out of the facility at 8 a.m. and again at 11:25 a.m. on December 31, 2001. Although the sign-out log did not indicate that Harris signed back in between 8 a.m. and 11:25 a.m., a back-up log maintained by Mirror's employees indicated that Harris returned at 9 a.m. The State highlighted several irregularities between the employees' log and the residents' log, and the Mirror supervisor acknowledged that Mirror's employees had not done their jobs like they were supposed to. Harris argued that he could not have traveled from Mirror on the north side of Wichita to the murder scene on the south side of Wichita in the 15 minutes between 11:25 a.m. when he signed out of Mirror and approximately 11:40 to 11:48 a.m. when the shooting occurred.

A jury convicted Harris of one count of felony murder, and the court sentenced him to life in prison with a minimum of 20 years before he could be paroled. Harris appeals his conviction directly to this court pursuant to K.S.A. 22-3601(b)(1), which gives this court jurisdiction over any appeal that results from a conviction for an off-grid crime or from a sentence of life imprisonment.

Harris claims that the trial court should not have allowed his confession to be admitted at trial because it was not voluntary. He argues that his confession was involuntary because he was confined in a small room for nearly 7 hours while shackled to the floor, he was isolated and prevented from communicating with the outside

world, and the police used unfair and deceptive interrogation techniques.

The suppression of a confession is reviewed using a dual standard. First, the factual findings are reviewed using a substantial competent evidence standard. An appellate court does not reweigh the evidence or pass on the credibility of witnesses but gives deference to the trial court's factual findings. Second, the ultimate legal conclusion drawn from the trial court's factual findings is a question of law which is reviewed de novo. See *State v. White*, 275 Kan. 580, 596-97, 67 P.3d 138 (2003).

In determining whether a confession is voluntary, a court must look at the totality of the circumstances and consider four factors: (1) the duration and manner of the interrogation; (2) the ability of the accused to communicate on request with the outside world; (3) the age, intellect, and background of the accused; and (4) the fairness of the officers in conducting the interrogation. The key inquiry is whether the statement is a product of the accused's free and independent will. *White*, 275 Kan. at 597. Coercion in obtaining a confession can be mental or physical. *State v. Caenen*, 270 Kan. 776, 784, 19 P.3d 142 (2001).

### Duration and manner

After being arrested, Harris was handcuffed and taken to the police station at approximately 12:30 p.m. He was placed in a 10 foot by 10 foot interview room, the handcuffs were removed, and he was shackled to the floor. Although he was allowed to take bathroom breaks as needed, Harris remained in an interview room until 7:14 p.m., when he was taken to the county jail. During the nearly 7-hour period that Harris was at the police station, detectives only interviewed him for about 2 and ½ hours. The remainder of the time, Harris was alone in the interview room. The interview ended when Harris became agitated with the detectives and tore up one of the detective's notes.

Harris complains that his interrogation was coercive because he was shackled throughout the process and the interrogation lasted too long. Harris fails to cite any case law establishing that a nearly 7-hour detention is too long. Likewise he has not pointed to any

case law to support his proposition that his confession was involuntary because he was restrained by shackles.

This court has previously determined that 7 hours is not too long to detain an accused for a custodial interrogation. In *State v. Brown*, 258 Kan. 374, 394-95, 904 P.2d 985 (1995), this court concluded that it was not coercive to interrogate a 17-year-old defendant with a 10th grade education for 7 hours before he confessed to murder. Like Harris, Brown only spent about 2 and ½ hours being interviewed by officers. The remainder of the time, Brown was alone in a room. However, unlike Harris, Brown was not restrained during the interrogation.

Although the defendant in *Brown* was not handcuffed or shackled during his interrogation, other case law establishes that this case is not distinguishable based on that fact. In *State v. Makthepharak*, 276 Kan. 563, 78 P.3d 412 (2003), a 16-year-old defendant was handcuffed to a table during a 5 and ½-hour interrogation. Nevertheless, the *Makthepharak* court concluded that the defendant's confession was voluntarily. 276 Kan. at 568.

Because case law fails to support Harris' claim that his confession was coerced by a lengthy interrogation in which he was shackled to the floor, this factor does not weigh in favor of finding Harris' confession involuntary.

### Ability to communicate on request with the outside world

Even though he did not request an attorney, Harris claims that he was isolated in the interview room and denied access to the outside world. Detective Chisholm denied using isolation as an interrogation technique but admitted that Harris' request to use the phone to call someone regarding an alibi was denied. The record does not indicate whom Harris wanted to call· or what the substance of the call would have been.

Harris fails to cite any authority to support his claim that his confession was involuntary because his request to use the phone was denied. In *State v. Bell*, 276 Kan. 785, 797-99, 80 P.3d 367 (2003), this court concluded that a 16-year-old defendant's confession was voluntary even though police failed to get the defendant's mother as requested and the defendant's mother was denied

access to him until after he made a statement. Accordingly, the denial of Harris' request to talk to someone about a possible alibi does not weigh in favor of finding Harris' confession involuntary.

### Age, intellect, and background of the accused

Harris was 24 years old at the time of his interrogation for Zeigler's murder. He had numerous juvenile adjudications and felony convictions beginning in 1990. He responded coherently and appropriately to questions regarding his personal history, denied consuming any alcohol or illegal drugs, but admitted that he had taken cold medicine and was using an inhaler before the interview. Harris does not claim any mental incapacity but, instead, argues that there was no evidence that he had been interrogated by police before his interrogation in this case. This argument is disingenuous given Harris' 12-year record, which includes convictions or juvenile adjudications for 45 prior charges. This factor does not weigh in favor of finding Harris' confession involuntary.

### Fairness of the officers conducting the investigation

Harris argues that his confession was coerced because his interrogators lied to him about their investigation. Specifically, Harris complains that Detective Chisholm lied to him about being identified by several people who witnessed the shooting and claimed to have physical evidence that did not exist. Harris also claims that the police refused to tell him that the eyewitnesses had identified someone else. Finally, Harris claims that his confession was coerced by trickery.

The record, however, does not substantiate Harris' claims that the police lied about what other witnesses were saying. Although Detective Chisholm's statements might have been interpreted ambiguously by Harris, the statements were not lies. Detective Chisholm told Harris, "I've talked to a number of people and I have been hearing that you were there." Detective Chisholm did not indicate how many people said Harris was at the shooting. Harris just assumed that several people said he was there.

Harris also argues that Detective Chisholm lied about whether Harris' photograph had been chosen in a photographic lineup. Har-

ris' interpretation of Detective Chisholm's statements makes assumptions about the statements without taking Detective Chisholm's words literally. Detective Chisholm testified that he told Harris that he had been "showing lineups to people and that people were picking people out of lineups." Harris assumed that his picture had been selected in a photographic lineup, but Detective Chisholm did not tell Harris that his picture had been selected. When Harris asked who had identified him, Detective Chisholm told him that information would come out in court. Although Detective Chisholm's response was evasive, it does not support Harris' claim that Detective Chisholm lied.

Harris also fails to substantiate his claim that Detective Chisholm misrepresented physical evidence that did not exist. Detective Chisholm testified that his partner saw a stain on Harris' coat. Although the detectives implied that the stain was blood, the coat was never sent to the lab for testing to confirm or refute that implication. The record does not establish whether there was a stain on Harris' coat. Thus, there is no way for us to determine whether Detective Chisholm's implication was false.

In *State v. Wakefield*, 267 Kan. 116, 127-28, 977 P.2d 941 (1999), the defendant claimed that his confession was involuntary because police lied to him during his interrogation. The *Wakefield* opinion does not specify what lies were told to the defendant, but the *Wakefield* court did not contest Wakefield's claim that the police lied. Relying on *Frazier v. Cupp*, 394 U.S. 731, 22 L. Ed. 2d 684, 89 S. Ct. 1420 (1969), which held that a confession was voluntary even though the police falsely told the defendant that his cousin had confessed, we held that deceitfulness by law enforcement officers during a custodial interrogation does not invalidate the voluntariness of a confession as long as the defendant's statements are the product of his or her free and independent will. See *Wakefield*, 267 Kan. at 128.

Harris fails to distinguish *Wakefield*, which we find controlling. Deceptive interrogation techniques alone do not establish coercion. Furthermore, there is no factual basis to support Harris' claim that his confession was coerced by deceptive interrogation techniques.

Harris also claims that his confession was coerced because Detective Chisholm did not advise Harris that four of the eyewitnesses had identified another man as the shooter. Detective Chisholm admitted that he did not tell Harris about the witnesses' identification of Harvell. However, police interviewed Harvell and determined that he had an alibi for the time of the shooting.

Harris does not cite any authority for the proposition that interrogators must provide all exculpatory evidence during an interrogation. Although the State has a duty to reveal any exculpatory evidence to the defense before trial, Harris fails to cite and our research fails to reveal any case law supporting Harris' theory that the same rule extends to police interrogations before the defendant has been charged with any crime. See *State v. Aikens*, 261 Kan. 346, 381-82, 932 P.2d 408 (1997) (holding that the State must advise the defendant of any exculpatory evidence before trial). We decline to extend the trial rules for exculpatory evidence to interrogations.

Harris further argues that the detectives tricked him into confessing to felony murder to avoid a charge of premeditated murder. Detective Chisholm admitted that they used themes and options as techniques for interrogating Harris. One of the themes was that the shooting was premeditated and that Harris had planned to kill the victim. Another theme eliminated the premeditation and suggested that Harris had been involved in a drug deal that went bad, requiring Harris to shoot the victim to defend himself. Detective Chisholm encouraged Harris to be truthful about what he was thinking at the time of the shooting to prevent a premeditated murder conviction with the potential for a 50-year minimum sentence.

We have refused to find a confession involuntary when the police encourage the accused to tell the truth. See *State v. Newfield*, 229 Kan. 347, 359, 623 P.2d 1349 (1981); *State v. Kornstett*, 62 Kan. 221, 227, 61 Pac. 805 (1900). The *Kornstett* court stated that "mere advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent." 62 Kan. at 227.

Here, Detective Chisholm encouraged Harris to tell the truth, but he did not promise any benefit or threaten any harm. Rather, Detective Chisholm properly stated the difference between premeditated murder and felony murder and informed Harris about potential sentencing differences between the two crimes. There is no indication that Harris' independent will was overcome by Detective Chisholm's forthright comments about possible charges. Harris knew at the beginning of the interrogation that it involved a murder. His failure to understand the elements of felony murder does not make his confession involuntary.

Harris has failed to substantiate his claim that his confession was involuntary because of deceptive interrogation techniques, *i.e.*, Detective Chisholm's failure to advise Harris that someone else was identified or Detective Chisholm's statements regarding the nature of possible charges. Accordingly, he has failed to demonstrate that the officers were unfair in conducting the investigation, and this factor does not support the conclusion that Harris' confession was involuntary.

The district court found that Harris was not under the influence of any drugs or alcohol and did not have any mental problems. While acknowledging that the interrogation was relatively long, the district court noted that there were a lot of breaks, including opportunities to use the rest room. Harris argued the detectives used isolation as a coercive tactic, but the district court found that the detectives were actively involved in checking out Harris' statements and other information, which required the interrogation to be interrupted. These findings are supported by substantial competent evidence. The totality of the circumstances demonstrates that Harris' confession regarding Zeigler's murder resulted from his free and independent will rather than coercion from his interrogators. Accordingly, we conclude that Harris' confession was voluntary and it was properly admitted at trial.

Next, Harris argues that the prosecutor improperly commented on his decision not to testify. He points to the following excerpt from the prosecutor's closing argument:

"I do want to point out instruction number 12 to you that I talked about that a defendant in a criminal trial has a constitutional right in a criminal trial not to

testify. You can't draw any inference from that. I know the 12 of you know that. The reason I point that out is because your verdict must be founded entirely upon the evidence admitted and the law as given through these instructions, okay, on the evidence. So, my question is who says Mr. Harris was scared and he makes it up. [Defense counsel] does.

"A trial is the free flow of information that the attorneys give to the factfinder, which is you, and through the rules of evidence and the law we give you what we want. [Defense counsel] sits up here and tells you oh, this is what Harris was really thinking, that he was scared. You have no evidence before you on that. You have no evidence. My point is that you base your verdict on the evidence, not what's not there, because then you go off on speculation: hey, why did the State dismiss that count two in the alternative charge, it was a felony murder where a robbery occurred. There's a very good reason. Why did I give 30 minutes of that tape and not the whole thing. There's a very good reason for that.

. . . .

"My point is that you base your verdict on the evidence, not [defense counsel's] convenient explanation that hey, my client was scared."

Harris did not raise an objection to the prosecutor's comments. However, his objection is not necessary if the comments prejudiced his Fourteenth Amendment right to due process. See *State v. Jones*, 273 Kan. 756, 782, 47 P.3d 783, *cert. denied* 537 U.S. 980 (2002).

When reviewing an allegation of prosecutorial misconduct, an appellate court applies a two-step analysis to determine whether a prosecutor's comments have denied a defendant his or her constitutional right to a fair trial. First, the court must determine whether the remarks were outside the considerable latitude that the prosecutor is allowed in commenting on the evidence. Second, the court must decide whether the comments were so gross and flagrant as to prejudice the jury against the defendant and deny him or her a fair trial, thereby constituting plain error requiring reversal. *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004).

The State is prohibited from making direct, adverse comments on a defendant's failure to testify on his or her own behalf. The State is also prohibited from making indirect comments if the language used was manifestly intended or of such a character that the jury would necessarily take it as a comment on the defendant's failure to testify. However, if the jury has been properly instructed regarding the burden of proof, the State may argue inferences

based upon the lack of evidence as long as those remarks do not draw an adverse influence on the defendant's failure to testify. *State v. McKinney*, 272 Kan. 331, 346-47, 33 P.3d 234 (2001).

In *McKinney*, the prosecutor told the jury that the defendant had failed to present any evidence to contradict the State's key witness, the defendant's uncle. The *McKinney* court concluded that the prosecutor's comments were not improper because the defendant failed to produce any evidence in general that his uncle had a motive to lie. 272 Kan. at 347. This conclusion relied on two premises. First, the State's assertion that the evidence is uncontradicted is limited only when it is highly likely rebuttal evidence would have to come directly from the defendant. See *State v. Milo*, 249 Kan. 15, 21-22, 815 P.2d 519 (1991). Second, there is no prejudicial error when the remarks are provoked and made in response to arguments or statements by defense counsel. See *McKinney*, 272 Kan. at 347.

In this case, the prosecutor's comments were in response to defense counsel's statement that Harris' confession was "full of lies because he's making it up because he's scared he's going to get charged with first-degree murder . . . ." The State rested solely on Harris' confession, so the credibility of the confession was a significant factor in determining Harris' guilt. The prosecutor's rebuttal comments appear to be aimed at reminding the jury that comments from Harris' attorney were not facts in evidence and that there was no evidence that Harris was scared to contradict the credibility of his confession. However, the only person who could testify regarding how Harris felt when he confessed was Harris himself.

This case highlights a conflict between the two premises relied on in *McKinney*—that there is no prejudicial error when the comments are provoked by the defendant and that the State may not make comments on the lack of contradictory evidence if the rebuttal evidence would have to come from the defendant's own testimony. See 272 Kan. at 347. In resolving this conflict, it is significant to note that the prosecutor first reminded the jury that Harris had a constitutional right not to testify and that it could not make any inferences based on his decision not to testify. We believe

that this prefatory remark mitigates the need for Harris' testimony to establish how he felt during the interrogation and eliminates any adverse influence on Harris' failure to testify. When considered in light of the prefatory statement and the court's instructions to the jury, the prosecutor's response to Harris' attorney's claim that Harris was scared does not rise to the level of being so gross and flagrant as to prejudice the jury against the defendant and deny his constitutional right to a fair trial.

Next, Harris claims that the trial court improperly admitted a portion of his codefendant's incriminating statements against him in violation of his constitutional right to cross-examine the witnesses against him. A defendant must make a timely and specific objection to the admission of evidence at trial to preserve the issue for appeal. K.S.A. 60-404; *State v. Flynn*, 274 Kan. 473, 496, 55 P.3d 324 (2002).

Harris argues that he objected to the testimony, but the record does not support his argument. The objection that Harris refers to is regarding statements made by Harvell. Detective Chisholm was testifying about his interview with Harvell when Harris' attorney made the following objection:

"Object at that point. We're approaching on hearsay basically to determine what had been told to Mr. Harris. I certainly accept the fact that the investigation of Mr. Harvell progressed and he was found not to be a suspect, but the details I believe are going to get into too much of a hearsay problem."

This objection does not address any statements made by Jackson, Harris' codefendant. Consequently, Harris has failed to preserve this issue for appeal.

For his next claim of error, Harris argues that the trial court should have granted his motion for a new trial based on newly discovered evidence. After trial, Harris' wife received a videotape from Donaldson in which Donaldson stated he was present when Zeigler was shot and that Harris was not there. Donaldson was wanted as one of the participants in Zeigler's murder but had managed to evade law enforcement officers until after Harris' trial. After making the videotape for Harris, Donaldson was arrested and gave conflicting statements to Wichita police, recanting his state-

ments on Harris' videotape and claiming that Harris sent him a script from prison.

In addition to the Donaldson videotape, Harris proffered evidence from Jackson's cellmate who would testify that Jackson had admitted Harris was not involved in Zeigler's murder but stated that she would lie to protect herself from a 20-year sentence. Harris met Jackson's cellmate on or about the second day of his trial. The trial court denied Harris' motion for a new trial, finding that Jackson's statements to her former cellmate were inadmissible hearsay and Donaldson's videotaped statements lacked sufficient credibility.

An appellate court reviews the denial of a motion for a new trial based on newly discovered evidence using an abuse of discretion standard. Judicial discretion is abused when no reasonable person would adopt the view taken by the trial court. See *State v. Moncla*, 273 Kan. 856, 861, 46 P.3d 1162 (2002). We apply a two-part test to determine whether a new trial was warranted. First, the defendant must establish that the newly proffered evidence could not have been produced at trial with reasonable diligence. Second, there must be a reasonable probability that the newly discovered evidence would produce a different result upon retrial. *McKinney*, 272 Kan. at 337.

Although the evidence from Jackson's former cellmate was not reasonably discoverable until after Harris' trial, the evidence was inadmissible hearsay because it was not a confession, a statement against Jackson's interest, or a statement by a person present and available for cross-examination. See K.S.A. 2003 Supp. 60-460(a), (f), and (j). Thus, it would not have produced a different result upon retrial. Likewise, the Donaldson videotape would not have produced a different result upon retrial. Donaldson recanted the statements in the videotape when he was interrogated by the police, so he had little, if any, credibility. The trial court did not abuse its discretion when it denied Harris' motion for a new trial based on newly discovered evidence.

Finally, Harris argues that he should be given a new trial because cumulative trial errors denied his right to a fair trial. This court looks at the totality of the circumstances to determine whether

cumulative errors have substantially prejudiced a defendant and denied his or her right to a fair trial. However, if the evidence is overwhelmingly against the defendant, no prejudicial error may be found on the cumulative effect rule. *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001).

Harris relies on the alleged trial errors he has raised in this appeal to establish cumulative errors. However, Harris has failed to demonstrate any trial errors. Accordingly, there is no reason to reverse Harris' conviction for felony murder based on cumulative trial errors.

Affirmed.