NOT DESIGNATED FOR PUBLICATION

No. 124,329

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

PHILLIP JASON GARRETT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed October 21, 2022.
Reversed.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Derek Schmidt*, attorney general, for
appellant.

*Mark J. Dinkel*, public defender, of Salina Regional Public Defender Office, of Salina, for
appellee.

Before CLINE, P.J., ISHERWOOD and HURST, JJ.

PER CURIAM:  The State appeals the district court's suppression of Phillip Jason
Garrett's confession to sexually violating his stepdaughter. During Garrett's law
enforcement interview, detectives stretched the truth and told Garrett that their Computer
Voice Stress Analyzer test was 100 percent accurate. Garrett voluntarily agreed to submit
to the test and the results purportedly suggested he lied about his innocence, so the
detectives suggested he simply acknowledge his guilt. Over the course of the interview,
Garrett eventually confessed, and the State charged him with 11 counts of rape, 8 counts

1

of aggravated indecent liberties with a child, 1 count of aggravated indecent solicitation of a child, and 2 counts of aggravated criminal sodomy. Prior to trial, Garrett moved to suppress his confession and, following a hearing, the district court concluded his confession was voluntary. Roughly 18 months later, however, the same judge inexplicably shifted course and, sua sponte, suppressed the confession, primarily because he now held the opposite opinion as to whether the officers' statements concerning the efficacy of the CVSA test adversely affected the voluntariness of Garrett's confession. The State appeals, arguing that a review of the totality of the circumstances demonstrates Garrett's confession was voluntary and the district court erred in ordering it suppressed. We agree with the State. Where the district court weighed the officers' misrepresentations contrary to the controlling legal authority for that principle, its ruling cannot stand. The district court's conclusion that Garrett's confession was involuntary is reversed.

FACTUAL AND PROCEDURAL BACKGROUND

In November 2018, 12-year-old L.A. disclosed to Salina Police detectives that her stepfather, Phillip Jason Garrett, repeatedly sexually assaulted her. Not long after, Garrett agreed to meet with and be interviewed by law enforcement authorities. Garrett met with the detectives in the station's media room, which was behind a locked door and adjacent to the lobby of the building.

Detectives Tim Brown and Gregory Jones started the interview at about 1:20 p.m. Jones told Garrett that they had to "jump through some hoops real quick" and then read Garrett his *Miranda* rights. Garrett waived his rights and agreed to speak with the detectives. Brown and Jones informed Garrett they needed to know about any possible sexual contact that occurred between him and L.A. and inquired about the nature of their relationship. Garrett said the two shared a good relationship and did not report any concerns. When Jones asked Garrett whether he had noticed changes in L.A.'s physical development, Garrett responded that he thought of her as his daughter, so he did not view

2

her in that light. They likewise posed the opposite question, whether Garrett thought L.A. viewed him as a romantic interest rather than a father figure. Garrett denied such a possibility, citing L.A.'s lack of maturity and her apparent interest in other young girls. The detectives then shifted to a more pointed line of questioning and wanted to know whether Garrett ever accidentally touched L.A. inappropriately. Garrett replied that he sometimes tickled the young girl but denied that he ever touched her in an improper manner. Jones then asked whether Garrett would take a Computer Voice Stress Analysis (CVSA) test to verify the truth of his statements. Garrett acknowledged that while the prospect made him nervous, he had nothing to hide. The detectives reassured him that his nervousness would not impact the exam.

Jones stepped out of the room to secure a CVSA technician and, while he was gone, Garrett shared with Brown that he had not eaten or slept since the previous evening because he knew something was going on with L.A. and the police wanted to talk to him about it. He expressed dismay over L.A.'s allegation that he behaved inappropriately and guessed it might be possible she was upset over a conversation they shared her about sexual orientation. Brown assured him that the CVSA test provided a reliable tool in helping to establish a person's innocence and that it was "actually more accurate" than a polygraph exam.

Jones returned a few moments later with Sergeant Sarah Cox, a CVSA technician. Cox explained that the test "measures the frequency in one's voice to determine whether or not that person is lying" and that it is "one hundred percent effective." Garrett reiterated that the test made him anxious, and the detectives again assured him that if he had done nothing wrong there was no cause for concern. Detective Brown then asked Garrett if he was willing to take the exam to verify his truthfulness, and Garrett expressed hesitancy and that he was second-guessing himself. At that point, Detective Brown said "we're not accusing you of anything" and the CVSA tool can help them "eliminate you of being a suspect of any wrongdoing." Cox then asked if Garrett was willing to take the

3

exam and offered to do it at that time. All three law enforcement officers then left the room, and Garrett waited alone for the test to begin for roughly 24 minutes.

Prior to administering the CVSA test, Cox presented Garrett with forms to sign. While reviewing them, Garrett inquired about the meaning of the term "coercion." Cox explained the contents of the documents to Garrett, but he claimed to be so devastated by L.A.'s allegations that much of the information Cox provided made little sense to him. Cox again informed him that the CVSA test is a highly effective truth verification exam.

Sergeant Cox started the exam with a reminder to Garrett of the allegations against him, that he touched L.A.'s vagina and anus and penetrated her vagina with his finger. She asked Garrett whether he had done each of these things, and he answered "no" to all. After the CVSA began, Garrett again denied touching L.A. in the manner described and reiterated that he was "extremely nervous." Cox explained that what Garrett was experiencing is known as "situational stress" and it would gradually dissipate as they progressed through the exam. During a second round of the same questions, Garrett again denied touching L.A. inappropriately.

After the test, Jones, Brown, and Cox reentered the interview room to discuss the results with Garrett. Cox explained the readout and clarified that it revealed a degree of stress accompanied Garrett's denial that he touched L.A.'s anus. When Cox asked why that might be, Garrett simply responded by again denying he ever touched L.A. in that way.

Brown said he believed Garrett loved and cared for L.A., and he did not think Garrett was "preying on children," but offered that perhaps something might have gone "too far" and Garrett possibly made a bad decision. When Garrett again denied wrongdoing, Brown clarified that he did not believe Garrett was a "monster," but simply that he suffered a critical lapse in judgment. Brown said the detectives believed L.A.'s

4

claims that Garrett sexually assaulted her, and that Garrett also knew her statements to be true. He told Garrett that he would prefer to be able to tell the prosecutor that Garrett was cooperative, acknowledged wrongdoing, and expressed remorse. Garrett acknowledged that he never wanted to hurt his kids, and when Brown asked whether Garrett would have stopped if L.A. had asked him to, Garrett threw his hands up and said, "yes." Garrett then confessed to touching L.A.'s vagina with his hand four or five times but claimed to have no recollection of any penetration. Brown replied that penetration did occur which prompted Garrett to offer additional details about the assaults. At the end of the interview, the detectives placed Garrett under arrest.

The State charged Garrett with 11 counts of rape, 8 counts of aggravated indecent liberties with a child, 2 counts of aggravated criminal sodomy, and 1 count of aggravated indecent solicitation of a child. Prior to trial, Garrett moved to suppress his confession, arguing his statements were elicited in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

The court conducted a hearing on Garrett's motion during which Cox, Jones, and Brown all testified about their interaction with Garrett. Videos of Garrett's interview, as well as his CVSA results, were admitted as exhibits. Gary Davis, an expert on truth verification technology, testified on Garrett's behalf and cited research that claimed the CVSA is, at best, 50 percent effective.

The court took the matter under advisement and ultimately denied Garrett's motion upon finding that the totality of the circumstances demonstrated Garrett's statements were a product of his free and voluntary will. It highlighted the following factors in support of its conclusion:

1. Jones was "very fair" in his tone and demeanor;

2. Garrett was stressed, but oriented to his time, place, and circumstance, and he was not denied the ability to communicate with the outside world;

3. The interview was brief;

4. Garrett was articulate, fluent in English, appeared to be "of average or above average intellect," and was about 40 years of age at the time of the interview;

5. Garrett was not coached in the specifics of the incidents or their timeline. The information he provided about the acts was unique to him; and

6. The detectives did not promise Garrett favorable treatment of any kind in exchange for a confession.

Roughly 18 months later, the district court reversed course, sua sponte, based largely upon the manner in which the CVSA was described and presented to Garrett. While the district court acknowledged that misleading a suspect is not entirely prohibited, in the court's opinion the extent to which the detectives oversold the CVSA process and their post-CVSA interview tactics strained the boundaries of permissible conduct. Thus, Garrett's resulting statements were involuntary, and suppression was the appropriate remedy.

The State timely appeals the district court's suppression of Garrett's confession.

ANALYSIS

*The District Court Erred When It Granted Garrett's Motion to Suppress*

The State argues the district court erred when it found the law enforcement officers' interview techniques yielded a coerced confession. Appellate courts review suppression decisions under a bifurcated standard. First, they review factual findings for substantial competent evidence. Second, the legal conclusion drawn from those factual

6

findings is a question of law subject to de novo review. *State v. Harris*, 279 Kan. 163, 167, 105 P.3d 1258 (2005).

The use of a defendant's confession obtained by either physically or mentally coercive tactics is prohibited by the Fourteenth Amendment. *Leyra v. Denno*, 347 U.S. 556, 558, 74 S. Ct. 716, 98 L. Ed. 948 (1954). In determining the voluntariness of a confession, courts must look to the totality of the circumstances, including: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language. *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010). Voluntariness does not stem from a tally of factors for each side. Rather, it is the collective effect of those circumstances that drives the assessment. *State v. Fernandez-Torres*, 50 Kan. App. 2d 1069, 1076, 337 P.3d 691 (2014).

In attempting to explain its rationale for arriving at an alternate conclusion on the voluntariness of Garrett's statement, the district court offered that the factor it found the most troubling was how the interviewing officers purportedly misled Garrett with respect to the effectiveness of the CVSA. From the district court's perspective, the CVSA was "akin to a psychological rubber hose" that rose to the level of an impermissibly manipulative technique. In its brief to us, the State asserts that the exaggeration of the CVSA's effectiveness, even if deceptive, does not flout either Kansas or federal law. Because discussions about the CVSA were the primary factor behind the district court's shift in opinion, we largely begin and focus our analysis there, despite its alignment with the fifth factor listed above—the fairness of the officers' conduct.

There is not a blanket prohibition on deceptive interview techniques. See *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969). In *State v.*

7

*Wakefield*, 267 Kan. 116, 977 P.2d 941 (1999), Wakefield confessed to a murder after a detective falsely told him that his fingerprints were found at the scene. Adopting the holding in *Frazier*, the Kansas Supreme Court held that a detective's misrepresentations do not automatically render an associated confession involuntary, so long as the totality of the circumstances reflects that the individual's statements stemmed from his or her free and independent will. 267 Kan. at 127. A similar conclusion was reached in *State v. Harris*, 279 Kan. 163, 105 P.3d 1258 (2005), where Harris confessed to a murder after a detective falsely told him several people identified him as the perpetrator and that the police had certain physical evidence connecting him to the killing. Again, the Kansas Supreme Court held that those deceptive interrogation techniques did not establish coercion that required invalidation of the confession. 279 Kan. at 170.

A panel of this court examined a similar issue in *State v. Bush*, No. 87,093, 2003 WL 27393413 (Kan. App. 2003) (unpublished opinion). There, after Bush took a polygraph exam, a detective told him that it was "obvious" that Bush sexually assaulted the minor in question. 2003 WL 27393413, at *4. Bush, operating under the belief that the polygraph established that he was lying about his innocence, provided law enforcement with a written confession. On appeal, Bush argued the police capitalized on his "ignorance about polygraph examinations to coerce his confession." 2003 WL 27393413, at *4. This court rejected the argument and found that the evidence viewed in its totality demonstrated there was sufficient evidence to show the confession was voluntary. Specifically, Bush signed a *Miranda* waiver, was not threatened or promised anything for his confession nor was he interrogated for an extenuated time period, he was not denied contact with the outside world, and did not suffer from any mental disability. 2003 WL 27393413, at *5. Thus, any ignorance Bush suffered concerning the nuances of lie-detection technology did not render his confession involuntary.

Kansas is not an island in its stance on this matter. In *Whittington v. State*, 147 Md. App. 496, 512-27, 809 A.2d 721 (2002), on appeal from the murder conviction she

acquired after killing her husband, Whittington argued that the district court erred in denying her motion to suppress because the interviewing officers used a false gunshot residue "blow back" test and a voice stress test as part of a long interview to coerce her confession. The reviewing court was not persuaded and instead concluded that "'[p]olice officers, charged with investigating crimes and bringing perpetrators to justice, are permitted to use a certain amount of subterfuge, when questioning an individual about his or her suspected involvement in a crime,'" thus the complained of tactics did not render Whittington's confession involuntary. 147 Md. App. at 521, 527. *Contee v. United States*, 667 A.2d 103 (D.C. 1995), provides another compelling example. In that case, Contee also underwent a CVSA as part of a murder investigation. The interrogating detective told Contee that the results dispositively revealed he was lying about his lack of involvement. After Contee confessed and was convicted of the murder, he appealed and argued the detective's deceptive statements related to the reliability of the CVSA rendered his confession involuntary. The D.C. Court of Appeals disagreed and held that the challenged conduct alone did not transform Contee's confession into an involuntary one. The rest of the evidence surrounding the issue revealed "no circumstances of coercion or trickery that, in combination with the CVSA test, can fairly be said to have overborne appellant's free will and compelled his confession." 667 A.2d at 104-05. See also *Townes v. State*, 253 So. 3d 447, 498 (Ala. Crim. App. 2015) (trickery or deception by law enforcement officers, in isolation, is not coercive enough to render incriminating statements involuntary); *State v. Graham*, 223 N.C. App. 150, 157-58, 733 S.E.2d 100 (2012) (confession was not involuntary simply as a product of law enforcement officer's false statements that Graham failed a polygraph test and was incriminated by a DNA test); *People v. Mays*, 174 Cal. App. 4th 156, 165, 95 Cal. Rptr. 2d 219 (2009) (provided a law enforcement officer's misrepresentations are not of the kind likely to produce a false confession, incriminating statements prompted by deception are admissible in evidence).

The district court wandered astray here in taking a hard stop against deceptive interview techniques in general. That position does not align with the current state of the law. Going a step further, there is not substantial competent evidence to sustain the court's conclusion that Garrett's will was overborne in this regard. As the testing period neared, Garrett repeatedly made his current level of anxiety known, explaining that he was "hyped up" and felt nervous and stressed arguably in a thinly veiled attempt to offer an innocent explanation for any stress registered by the test. Further, given the fact Garrett was able to independently provide details of the incidents, he knew participation in the test would require him to be dishonest, presumably with the hope that he could suppress any incriminating, corresponding stress levels. Had he fully embraced the officers' assertions that the test was 100 percent effective, he likely would have seized one of the multiple opportunities they offered for him to either decline or refuse to continue with the test. So, while law enforcement's deception about the reliability of lie detection technology is relevant to the involuntariness analysis, it is not dispositive. The totality of the interview techniques demonstrate that Garrett voluntarily spoke to the detectives and the deception alone fails to provide the support required to treat Garrett's confession coerced and involuntary.

The district court's disagreement with the interview tactics also extended to those interactions the detectives had with Garrett following the exam, which the district court characterized as "too egregious for the court to ignore." Garrett claims the detectives employed the Reid technique—a practice where the interviewer offers an understandable justification for illegal behavior presumably to prompt incriminating crimes. The State contends that this methodology was not employed but that even if elements of it are present, the technique was not unduly coercive.

The detectives here denied that they wholesale employed the Reid technique. Rather, they merely implemented some of its tactics. The technique was part of a

10

voluntariness issue addressed by a panel of this court in *Fernandez-Torres*, 50 Kan. App. 2d at 1086-87, which provided the following description:

> "The officer first should isolate the suspect in unfamiliar surroundings, such as a police interrogation room. Then, the guilt of the suspect 'is to be posited as a fact.' The questioner should solicit reasons why the suspect might have committed the offense, such as a bad family life or having drunk too much. The technique then instructs the officer 'to minimize the moral seriousness of the offense.' The intended effect of the technique is 'to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty.' To complete the strategy, the questioner must dismiss and discourage any contrary explanation, i.e., innocence. This technique, often referred to as the Reid method, remains widely used. [Citations omitted.]"

The *Fernandez-Torres* panel wrote that this technique carries "the potential to undermine free will through psychological ploys crafted to introduce inculpatory statements with what amount to undue influences on some suspects in some circumstances." 50 Kan. App. 2d at 1092. For that reason and others, the panel concluded Fernandez-Torres' confession was coerced and suppression was proper. 50 Kan. App. 2d at 1092-93. But see *United States v. Jacques*, 744 F.3d 804, 812 (1st Cir. 2014) (the exaggeration of evidence along with use of the Reid technique did not make a confession involuntary); *State v. Rejholec*, 398 Wis. 2d 729, 750, 963 N.W.2d 121 (Wis. Ct. App. 2021) (the defendant "offers no authority concluding that the use of the Reid technique itself creates a coercive environment"); *Shelby v. State*, 986 N.E.2d 345, 365-66 (Ind. Ct. App. 2013) (use of the Reid technique did not render the confession involuntary).

But *Fernandez-Torres* also involved several troubling factors that are not present here. For example, Fernandez-Torres did not speak English fluently and received the help of a translator whose skills were subpar. Additionally, Fernandez-Torres had a below-average intellect and possibly suffered from a learning disability. Thus, while the panel did not speak favorably of the Reid technique, it also rejected "a divide-and-conquer

11

approach to assessing the involuntariness of a confession." 50 Kan. App. 2d at 1092. In other words, again, a single deceptive interrogation tactic viewed in isolation does not establish coercion—it must be viewed alongside other factors to assess the totality of the circumstances, including Fernandez-Torres' low intellect, and the botched translation. Similar aggravating factors are not present here, and there is otherwise no evidence to support the district court's conclusion that the officers' post-exam interview tactics were too egregious to allow for a finding of voluntariness.

In our view, the district court entered its second ruling almost entirely as a product of its discontent with the CVSA and its attendant discussions, rather than adhering to its obligation to conduct a full and fair assessment based on the totality of the circumstances. Shining a light on those factors reveals that Garrett's mental condition was stable and he was not subject to undue duress. While he admitted to experiencing stress, the evidence reflects that anxiety started to simmer the night before his interview after reviewing a text on his wife's phone from L.A.'s father about this matter. The manner and duration of Garrett's interview was also nonremarkable. The evidence reflects it started at roughly 1:30 in the afternoon and lasted only about 2 hours, which we find to be a reasonable length of time. While the record is absent any facts addressing whether Garrett sought to communicate with the outside world at the time, there is no evidence suggesting such a request was made and denied. Finally, turning to Garrett's age, intellect, and background. The evidence adduced demonstrated that Garrett was about 40 years old, married with a family, and worked in two capacities at a local store with one of those roles carrying managerial responsibilities. Accordingly, there is no evidence tending to show Garrett lacked the intellectual capabilities to appreciate his circumstances or what was being asked of him.

The undue weight the district court afforded the deceptive techniques, to the exclusion of nearly all other relevant components of the inquiry, gave rise to a finding of involuntariness that is neither grounded in substantial competent evidence nor consistent

with the longstanding law in this area. Accordingly, that decision cannot be permitted to stand. The district court's conclusion that Garrett's statements were involuntary and its suppression of the same is reversed.

Reversed.

\* \* \*

HURST, J., concurring:  I join with the majority in holding that the district court erred in suppressing Garrett's statements, and its decision must therefore be reversed, but I do not join the court's opinion.

The facts and procedural posture are largely undisputed, and Garrett's police interview was recorded and available for both the district court and this court to review. Garrett moved to suppress his statements to police during his interview, claiming they were involuntary, and the district court initially denied the motion and found the statements were voluntary. Months later, however, the district court sua sponte determined that the unfairness of the interview weighed heavily in favor of finding that Garrett's statements were involuntary under the totality of the circumstances. The district court based its finding on the interviewers' use of the Reid interview techniques coupled with their deceptive statements promoting the accuracy of the Computer Voice Stress Analysis (CVSA) exam.

Whether a defendant's statement or confession is voluntarily given is determined under the totality of the circumstances, based upon multiple factors including the:
(1) Defendant's mental condition;
(2) interview's manner and duration;
(3) defendant's ability to communicate on request with the outside world;
(4) defendant's age, intellect, and background;
(5) officer's fairness in conducting the interview; and

13

(6) defendant's fluency with the English language.

*State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010).

A totality of the circumstances standard can give rise to differing opinions on the weight or importance of each factor under the given circumstances.

On appeal, this court reviews the district court's decision to suppress Garrett's statements using a two-prong approach, first reviewing the district court's factual determinations for substantial competent evidence, without reweighing the evidence, and then reviewing its ultimate legal conclusions de novo. *State v. Garcia*, 297 Kan. 182, 186, 301 P.3d 658 (2013). This court's ultimate inquiry is whether Garrett's statements were a product of his "free and independent will" or if his will was overborne by the State's coercive conduct. See, e.g., *State v. Swanigan*, 279 Kan. 18, Syl. ¶ 2, 106 P.3d 39 (2005). While no single factor is dispositive of coercion, unfair interview techniques—including deception—considered under a totality of the circumstances can overcome a defendant's free will, thereby rendering their statements involuntary. See, e.g., *Garcia*, 297 Kan. at 197 (finding unfair interview technique of implicit promise of leniency rendered confession involuntary under the totality of the circumstances); *Swanigan*, 279 Kan. at 39-40 (finding unfair interview technique of telling defendant false information about evidence rendered confession involuntary under the totality of the circumstances).

I.    *Substantial competent evidence supports the district court's findings.*

Under the first prong, substantial competent evidence supports the district court's determination that the interviewers engaged in unfair, deceptive interview techniques. In addition to lying about the effectiveness of the CVSA exam, which is similar to lying about the existence of evidence, the interviewers admitted to employing some of the Reid interview techniques which a panel of this court explained "may induce individuals to give necessarily false confessions to crimes they never committed, especially if they are

14

guileless or otherwise particularly susceptible to external influences." *State v. Fernandez-Torres*, 50 Kan. App. 2d 1069, 1087, 337 P.3d 691 (2014).

*Interviewer Deception about the CVSA Exam*

After Garrett denied inappropriately touching his stepdaughter, the interviewers asked if he would submit to a CVSA exam to determine his truthfulness. The interviewers ultimately lied to Garrett about the CVSA exam effectiveness and results. Detective Jones explained the CVSA as a "truth verifying test" and asked if Garrett was willing to submit to the exam "in order to verify what you're saying is true." Garrett expressed his nervousness, and the interviewers explained that nervousness was "not part of the equation" and that being nervous during the exam was normal but would not affect the results. Detective Jones then suggested bringing in a CVSA technician to ease Garrett's concerns and explain the CVSA exam process. While waiting for the technician, Detective Brown brought the conversation back to the CVSA exam and explained it was a "fantastic tool to help us move past any wrongdoing that uh, that you uh, may be accused of." Detective Brown further described the CVSA exam as an "excellent tool" and stated that it was "normal to be nervous." Garrett explained that he was worried his nervousness and lack of sleep and food would be interpreted by the exam as deception and asked if the exam was like a polygraph. Detective Brown responded that the CVSA was similar to a polygraph but was "actually more accurate" than a polygraph and the administering technician could better explain how it works.

Sergeant Cox then entered the interview room and explained that she was one of the department's CVSA examiners and was there to explain how the exam worked. She said the CVSA exam was different than a polygraph but it "does measure the frequency in one's voice to determine whether or not that person is lying." She explained the CVSA exam process and that Garrett would be asked three types of questions—one of which required him to intentionally lie so they could "see what your lie patterns look like in

chart formation." Sergeant Cox further explained to Garrett that he would have no problem if he was telling the truth, but if he was "lying about these specific questions the stress is going to pop up on those charts like nobody's business and we're going to know." Cox stated to Garrett that the exam is "a hundred percent effective." She further reassured Garrett that his underlying stress level would not influence the exam results and that the CVSA exam "is a hundred percent effective" and "it doesn't matter if someone is drunk or high or sober, it's still going to measure that frequency in that stress . . . in your vocal cords." Garrett expressed apprehension about the CVSA exam, and the interviewers reassured him again that the exam would "verify that what you're saying is true" and that "the CVSA is a wonderful tool because it helps us . . . eliminate you as being a suspect of any wrongdoing."

The interviewers' deception about the CVSA exam's effectiveness did not stop once Garrett agreed to take the exam but persisted throughout the examination. While preparing for the CVSA exam, Sergeant Cox explained it was "not to catch [Garrett] in a lie, but to verify the truth." She claimed the CVSA exam was used all over the United States, including by the military, and that it was considered a "truth verification exam and it is a hundred percent effective." She then said that no matter the condition of the examinee—high, drunk, or sober—"it's going to be a hundred percent accurate." Sergeant Cox then minimized the gravity of the accusations by explaining that everyone has made mistakes, and she repeatedly said her job was to get Garrett through the exam and that she wanted him to pass the test.

After the exam, Sergeant Cox explained that a graphic of truthful responses would look like a Christmas tree while answers demonstrating stress would look like a tree trunk. The interviewers then told Garrett that the exam showed that he demonstrated stress when answering specific questions about touching his stepdaughter's anus. Garrett again denied inappropriately touching his stepdaughter.

16

The State does not deny that the interviewers were wrong about the effectiveness of the CVSA exam but submits that "it seems that the police themselves believed the truth of their assertions" and thus did not engage "in a calculated plan of deception." This court cannot say that an officer's ignorance of the veracity of their statements—when made with the intention of the person relying upon them—makes such statements less deceptive. The district court heard testimony from a defense expert witness that a leading, peer-reviewed field study developed by the National Institute of Justice—a division of the United States Department of Justice—found the CVSA exam to be no more than 15-50 percent effective at detecting deception. The expert also testified that he was unaware of any independent, peer-reviewed study showing that the CVSA exam was 100 percent effective and explained that "[t]here is no unique physiological response for deception." The State provided no evidence that the CVSA exam was 100 percent effective. As such, the district court had substantial competent evidence to support its conclusion that interviewers deceived Garrett about the effectiveness of the CVSA exam.

*Other Interview Techniques*

Here, detectives employed some of the Reid interview techniques examined by the *Fernandez-Torres* panel. See 50 Kan. App. 2d at 1086-87. Prior to administering the CVSA exam, the interviewers tried to gain Garrett's confidence when they did not initially disclose the purpose of the interview, minimized the *Miranda* warnings, and lied to Garrett about the accuracy and effectiveness of the CVSA exam. After the CVSA exam, the interviewers used the results to question Garrett about his answers which allegedly demonstrated stress, repeatedly interrupted him—which prevented him from denying wrongdoing—told him that they knew the truth, and provided him with an option to minimize his wrongdoing.

When Garrett became upset at the accusations, the interviewers changed tactics and told Garrett they believed he was a loving stepfather, minimized the alleged incident,

17

and suggested to Garrett that he just made an isolated mistake. Garrett again denied wrongdoing. Detective Brown then told Garrett that he believed Garrett made a bad decision, that he remembered it, that he touched his stepdaughter on her genitals, and that Garrett knows it to be true and given the situation he would "much rather go to the prosecutor and say . . . Phillip . . . owned up to his wrongdoing . . . he was cooperative . . . those things go a long way." Detective Jones assured Garrett that confessing to the incident "reflects well upon you." Detective Brown said he believed that Garrett did not want to hurt his stepdaughter, things just went too far, and Garrett told her that he would stop if she did not want him to continue the touching. Garrett then confirmed that he recalled telling her that, and Detective Brown said he appreciated Garrett's cooperation. It was after this exchange that Garrett made inculpatory statements about his actions.

The district court correctly determined that these techniques mirrored several of the Reid interview methods which are designed to psychologically overcome someone's reluctance to admit wrongdoing. See *Fernandez-Torres*, 50 Kan. App. 2d at 1086-87 (discussing the Reid interview methods). The inquiry thus becomes whether, under all the circumstances, these techniques and deception did in fact overbear Garrett's independent free will.

*Factors Demonstrating Voluntariness*

Garrett does not claim, nor does the interview video demonstrate, that his mental state or condition caused him to be overcome by the interviewers' techniques or made him susceptible to coercion. During the interview, he does not appear to experience undue stress or strain. He did not claim he was taking medication or that he suffered from a condition which made it difficult to understand his circumstances. At various points, he did express being nervous, worried, and stressed—but at no point did those feelings manifest in an inability to interact with the interviewers or appreciate the circumstances of the questioning. Moreover, Garrett does not claim any condition or state of being that

18

would make him particularly susceptible to external influences. See *Swanigan*, 279 Kan. at 39-40 (explaining that a defendant's mental state, under the totality of the circumstances, can contribute to involuntary statements).

The manner, duration, and location of the interview were reasonable. Garrett's interview began shortly after 1 p.m. when he voluntarily went to the police station and lasted about two hours, which included about 24 minutes of Garrett waiting in the interrogation room. Garrett was not interviewed at an inconvenient time of day outside of his control, nor was he brought to the police station under duress. Moreover, the interview was not particularly long. Before agreeing to speak to Detective Jones, Garrett knew that his stepdaughter's father had told Garrett's wife that she needed to contact Detective Jones before he would discuss their daughter returning to her and Garrett's house for the holidays. Garrett told detectives that he and his wife speculated about the reasons for police involvement and that Garrett was worried that he could have caused a problem. Although he was not aware of the specific allegations when he arrived at the police station, Garrett knew that he was involved with some problem that required police involvement and caused a parenting time dispute with his wife's ex-husband.

Once at the police station, interviewers read Garrett his *Miranda* rights, asked if he understood them, and asked him to initial each understanding. The interviewers initially minimized the importance of the need to give Garrett his *Miranda* warnings, but later in the interview—after Garrett became aware of the allegations against him—Sergeant Cox read Garrett his *Miranda* rights without minimizing their importance. In fact, she explained that "because I will be asking some questions related to a criminal matter, um, I do have to advise you of your rights, okay? . . . It does not mean that you are under arrest at this time, I just want you to know what your rights are." She also told him he could stop the CVSA exam anytime he wanted. After the first 10-15 minutes of the interview, the interviewers did not disguise or hide the purpose of their questions. Sergeant Cox told

19

Garrett he was being asked questions as part of a criminal investigation, and Garrett understood the consequences enough to deny any wrongdoing.

There is no evidence Garrett was prevented from contacting the outside world during his interview. Interviewers read Garrett his *Miranda* rights twice, which included his right to speak with an attorney and have one present during questioning. He did not make such a request. Garrett's mother was at the police station during the interview, and he did not ask to speak to her. He did not ask to use his phone to call anyone, and there is no evidence that he was told before or during the interview that he was not permitted to make such contact.

Garrett's age, intellect, fluency in English, and background do not make him particularly susceptible to the deceptive interview techniques. Garrett is a native English speaker and did not exhibit any signs of misunderstanding the interviewers' questions or statements. Garrett was about 40 years old at the time of the interview, and he had a spouse, children, and a full-time job. There is nothing in the record indicating he had personal experience with police interview techniques, but he did tell interviewers that he had seen polygraph tests depicted on television and heard they were not accurate. Garrett had enough life experience and intellect to appreciate the seriousness of his situation, to know what the administration of a traditional polygraph exam looked like, to know that polygraph exams are not considered accurate, and to ask questions about the CVSA exam relative to that experience.

II.     *Analysis of the Totality of the Circumstances*

Although the district court accurately relied upon substantial competent evidence to find that the interviewers engaged in unfair interview techniques, including deception, the analysis does not stop there. This court must determine whether, under the totality of the circumstances, the unfair interview techniques rendered Garrett's statements

20

involuntary. The type of unfair interview techniques employed in this case, when considered among the many other relevant factors, demonstrate that Garrett voluntarily confessed. While the interviewers lied about the effectiveness of the CVSA exam, they did not overly or repeatedly rely on its results and did not lie about the existence of physical evidence supporting Garrett's guilt. The interviewers' deception *alone* does not necessarily render Garrett's statements involuntary. See *State v. Ackward*, 281 Kan. 2, 10-11, 128 P.3d 382 (2006) (deceptive statements alone do not make a confession involuntary per se); *Stone*, 291 Kan. at 23, 32-33 (finding deceptive techniques combined with other factors made statements involuntary).

In *Ackward*, the interviewer lied to the defendant about the existence of several pieces of evidence, including surveillance camera footage of the defendant, a gunshot residue test that would show if he had "even held a gun within 48 hours," and a cooperating witness. 281 Kan. at 9. The interviewers also implied the defendant's confession would lead to a more lenient result—essentially misstating the law. Ultimately, the court found Ackward's statements voluntary because the unfair or deceptive interview techniques were not pervasive and the other factors did not demonstrate coercion. 281 Kan. at 16. As in *Ackward*, the deception here was not pervasive—while the interviewers extolled the accuracy of the CVSA exam, they did not heavily or repeatedly rely on its results. While the interviewers led Garrett to believe that some of his answers demonstrated stress, they did not say that the exam proved he lied or proved his guilt, and they did not belabor the exam results. They asked Garrett about the results just once or twice before changing tactics. Additionally, the interviewers did not lie about the existence of physical evidence, witnesses, or surveillance footage.

In *Stone*, contrarily, the court found the interviewer's deceptive techniques made Stone's statements involuntary because the officer implied Stone's DNA was on the victim's clothes when there was no such DNA to be tested, repeatedly told Stone to tell the truth while giving him facts, and then told him that only a confession would impact

21

his jail sentence. 291 Kan. at 22-23. Additionally, Stone was sleep-deprived, the interview took place at 1 a.m., and Stone explained that he often became confused when under pressure—which the court witnessed in the interview. Unlike the circumstances in *Stone*, the interviewers here did not lie about the existence of physical evidence, stopped short of implying Garrett could avoid or minimize jail time by a confession, did not repeatedly deny his truthfulness, and conducted the interview at a reasonable time of day. Moreover, unlike Stone, Garrett did not merely adopt the factual statements given to him by the officer.

Although Garrett's initial inculpatory statement was merely a confirmation of a factual statement provided by one of the detectives, Garrett then described his actions and answered questions using his own words and descriptions. He did not merely confirm the interviewers' allegations but provided independent facts describing his illegal conduct. He gave specific accounts and memories of the events wholly unrelated to the interviewers' assertions. Additionally, he continued to deny certain more serious allegations that the officers suggested had occurred—further demonstrating the voluntariness of his inculpatory statements.

The totality of the circumstances demonstrate that the interviewers' unfair interview techniques did not overbear Garrett's free and independent will:

(1) Garrett voluntarily went to the police station with a family member at a reasonable time;

(2) the interview lasted about two hours, which included breaks and the CVSA exam;

(3) the interviewers maintained a calm tone and demeanor;

(4) the interviewers told Garrett he was the subject of a criminal investigation well before he confessed;

(5) Garrett was of an age, language fluency, and intellectual ability sufficient to understand the consequences of his actions and statements;

22

(6) after a detective initially minimized Garrett's *Miranda* rights, Sergeant Cox provided a second set of *Miranda* warnings without minimization;

(7) Garrett ultimately confessed, providing details and information not suggested to him by the interviewers; and

(8) Garrett continued to deny serious allegations that the interviewers suggested occurred.

CONCLUSION

The district court correctly determined that the interviewers used deception and psychological techniques which contributed to an unfair interview, but that alone did not render Garrett's confession involuntary. The totality of the circumstances demonstrate that Garrett's statements were voluntary, and the district court therefore erred in suppressing them.