NOT DESIGNATED FOR PUBLICATION

No. 125,086

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TIMOTHY E. KELLNER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Submitted without oral argument. Opinion filed January 19, 2024. Affirmed.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

Before BRUNS, P.J., CLINE and HURST, JJ.

HURST, J.: A jury convicted Timothy E. Kellner of aggravated indecent liberties with a child for his inappropriate touching of the six-year-old victim. He was sentenced to the statutory penalty of life imprisonment with a minimum of 25 years served before any possibility of parole. On appeal Kellner claims that his conviction should be reversed, and he is entitled to a new trial because trial errors from prosecutorial missteps to erroneous jury instructions deprived him of a fair trial. In the event this court was unpersuaded to reverse the jury's decision based on those alleged errors, he also argues that the district court abused its discretion by denying him a durational or dispositional

1

departure from the presumptive sentence. Despite the litany of errors asserted, this court finds no reversible error and affirms Kellner's conviction and sentence.

FACTUAL AND PROCEDURAL BACKGROUND

On February 27, 2019, the State charged Timothy E. Kellner with two counts of aggravated indecent liberties with a child, arising from his alleged abuse of a then six-year-old child on or between February 21 to 22, 2019, and sometime on or between December 25, 2018, and February 20, 2019. Although the State dismissed one of the counts, after a trial in January 2022 the jury found Kellner guilty of one count of aggravated indecent liberties with a child. Among Kellner's many allegations, he claims there was insufficient evidence to sustain his convictions, which requires this court to recite the relevant facts underlying his conviction.

At trial the victim testified that she told her mom that Kellner "had touched me in my private" and that her mom took her to talk to the police. The victim said that when she was in her bed in the basement Kellner "came in my room and laid beside me and started to pull down my pants. And then [he] had touched me" with his "arm and his hand" on the butt. She later testified that Kellner also pulled down her underwear at that time. On cross-examination the victim confirmed that Kellner touched her once in this manner.

The victim's mother testified that on the night of February 21, 2019, she and the victim, her daughter, had fallen asleep on the living room couches, but she awoke at about 12:30-1:00 a.m. and went to bed while her daughter continued to sleep on the couch. The next day, on February 22, 2019, the victim's mother and her friend were in the living room when the victim "described a scenario from the evening before, at which [Kellner] caressed in between her legs with . . . what she believes is his arm." The victim's mother and her friend took the victim to a police substation and met an officer who interviewed the mother and her friend. The Axon video footage of that police

2

interview was admitted at trial. On cross-examination, the victim's mother testified that at that time she wanted to talk to Kellner because she did not want to jump to conclusions but confirmed the officer did not allow her to talk to Kellner.

The officer transported the victim and her mother to the Child Advocacy Center (CAC) where the victim was interviewed outside the presence of her mother. The officer later transported the victim and her mother to the hospital where nurses photographed and swabbed the victim.

The forensic nurse examined the victim at the hospital from 12:32 a.m. until after 1:30 a.m. and documented on a diagram admitted into evidence that the victim had "red, purple bruise with swelling" on the labia majora and "excess skin to the anal area" in the top part of her anus. The forensic nurse also confirmed that she took swabs from the victim's labia majora where the bruising was seen, her labia minora, anal area, and the space between her anus and vagina, as well as an oral swab so that they could gather the victim's genetic information and compare it to any genetic material found elsewhere on her body. The forensic nurse confirmed that she did not see any pubic hairs, lubricants, or clothing fibers on the victim. She also confirmed that it was possible for a man to discharge seminal fluid while sleeping.

On cross-examination, the victim's mother confirmed that at the time of the incident, the victim had a history of wetting the bed and that cleaning her up would generally require wiping between her legs and in her vaginal area. She also confirmed that Kellner would sometimes clean the victim and the victim would sometimes sleep in their bed or want to be close to them. Although she testified that the next morning Kellner told her that he had taken the victim to bed, she confirmed that Kellner did not report changing the victim the night of the incident.

The mother's friend also testified about the victim's disclosure and that the victim "came up to her mom and I, and told us that [Kellner] had touched her." After being asked, the victim said she was sure about what happened and then demonstrated that Kellner touched her on her butt. The friend estimated that about an hour passed between the victim's initial disclosure and getting to the police substation.

A detective interviewed the victim at the CAC at about 10:00 p.m. on February 22, 2019, and a video of the Exploited and Missing Child Unit (EMCU) interview of the victim was admitted at trial. During the EMCU interview, the detective stated that the victim disclosed that two incidents occurred—one after Christmas 2018 and one the night before the interview. During cross-examination, the detective confirmed that during the initial victim interview she described that Kellner was standing during the incident but testified at trial that he was laying down behind her. The detective also confirmed that a few days after the interview, he spoke to the victim again and she told him that she had a wreck on her bicycle and had been scratched by a cat.

The detective also interviewed Kellner late in the evening of February 22, 2019, and confirmed that Kellner was able to answer the initial personal information questions, appeared to understand the questions, and gave appropriate responses. At trial the detective recounted what Kellner said during the interrogation. The detective testified that Kellner said "he woke up around 3:00 in the morning. Went upstairs. Found [the victim] asleep on the couch . . . So he carried her back downstairs and placed her in bed." The detective stated that during the interrogation, Kellner was very talkative about things irrelevant to the case but that he did not seem overly nervous. Kellner stated that he pulled down the victim's pants and was "rubbing his penis in between her legs." After that disclosure, the detective testified that Kellner explained that when he was carrying the victim, she told him that she loved him and "that that's what set things in motion."

4

During the interrogation Kellner explained that he accessed a video on his phone from the internet that he characterized as a Japanese video with a young-looking girl whose father character in the video did something similar to the girl. The detective confirmed that Kellner was describing placing his penis between the victim's legs. After obtaining a search warrant for Kellner's phone, the detective was able to view the video Kellner described.

The detective confirmed that Kellner was not permitted to speak to his wife or other family during the interrogation. The detective also confirmed that during the interrogation he was not wearing a firearm and was wearing a badge that was likely covered by his jacket. However, the detective denied that Kellner was handcuffed and stated that Kellner "could have asked to leave" but confirmed that Kellner was placed in a locked interrogation room with no windows and no phone and would have needed assistance to leave. The detective testified that Kellner likely sat in the interrogation room prior to the interrogation for about an hour and 15 minutes. The detective confirmed that he continued to question Kellner despite knowing that he had a cold, had little sleep, and was tired.

*The Video and Forensic Data*

A digital forensic examiner with the Wichita Police Department EMCU, Internet Crimes Against Children Task Force, testified that she examined Kellner's cell phone and created a report. She found the video described by Kellner as the Japanese video in the phone's deleted area — meaning it had previously been stored on the phone. The digital forensic examiner confirmed that in searching Kellner's cell phone she identified that he had searched for pornography at 4:00 a.m. on the date of the alleged incident. The report showing Kellner's relevant internet searches were admitted at trial.

A KBI forensic scientist testified that she received a synopsis of the allegations and the victim's sexual assault kit. She explained that after swabbing the victim's labia majora and buttocks, she conducted two different tests for seminal fluid on the swabs. The first chemical indicator test was negative for the presence of seminal fluid, but when she viewed the swabs through a microscope she saw sperm, indicating the presence of seminal fluid. She then conducted a DNA profile analysis of the seminal fluid on the swab which revealed that the DNA profile from the seminal fluid was consistent with Kellner's DNA profile. The forensic scientist testified that seminal fluid is present in pre-ejaculation or ejaculation and that there "needs to be some sort of stimulation and release in order for seminal fluid to be present." She confirmed that seminal fluid could be produced during a "wet dream" and leak through clothing onto other items and confirmed that DNA can be transferred by contact such as if a person picks up another.

A former crime scene investigator with the Wichita Police Department testified that during the search of Kellner's home they used an alternative light source to identify fluids such as urine, semen, and sweat stains on the victim's bedsheets. However, stains identified on the bedsheets did not indicate the presence of seminal fluid. So, there was no semen found on the victim's bedsheets.

The jury found Kellner guilty of one count of aggravated indecent liberties with a child, and the State dismissed the second count. Kellner, through his attorney, moved for dispositional and durational departure. After a hearing on the motion, the district court denied Kellner's motion and he was sentenced to life in prison with a minimum of 25 years. Kellner appeals.

DISCUSSION

Kellner appeals his conviction alleging the following errors: (1) the district court erred in admitting his statements made during interrogation; (2) the district court erred in finding he waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ; (3) the district court erred when it denied his motion to dismiss for constitutional speedy trial violations; (4) there was insufficient evidence to show he touched the victim with the required statutory intent; (5) the district court erred by omitting an essential element of the aggravated indecent liberties with a child jury instruction; (6) the prosecutor erred in closing argument; (7) cumulative error denied him a fair trial; and (8) the district court erred in denying his motion for durational and dispositional departure in sentencing. This court will address each allegation in turn.

## I. THE DISTRICT COURT DID NOT ERR IN FINDING KELLNER VOLUNTARILY MADE THE INCULPATORY STATEMENTS DURING INTERROGATION

Kellner claims that his statements during interrogation were involuntary, and as such, the statements should not be admitted during trial. After a *Jackson v. Denno* hearing, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), requested by the State, the district court found Kellner's statements were freely, voluntarily, and knowingly made and thus admissible. This court reviews the district court's ruling after a hearing on the admissibility of the victim's statements to police using a bifurcated standard by reviewing "the factual underpinnings of the decision under a substantial competent evidence standard and reviews the ultimate legal conclusion drawn from those facts de novo." *State v. Lowery*, 308 Kan. 1183, 1218, 427 P.3d 865 (2018) (quoting *State v. Harris*, 279 Kan. 163, 167, 105 P.3d 1258 [2005]). Substantial competent evidence is "legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion." *State v. Walker*, 283 Kan. 587, 595, 153 P.3d 1257 (2007). This court "does

not reweigh evidence or assess the credibility of the witnesses but will give deference to the trial court's findings of fact." *Lowery*, 308 Kan. at 1218.

The State has the burden to prove by a preponderance of the evidence that Kellner's statements were voluntarily made, that they were the product of his free and independent will. See *State v. Mattox*, 305 Kan. 1015, 1042, 390 P.3d 514 (2017). This court considers the totality of the circumstances surrounding Kellner's confession to determine voluntariness. *Lowery*, 308 Kan. at 1218-19. The nonexclusive list of factors to consider include: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language. *State v. Parker*, 311 Kan. 255, 259, 459 P.3d 793 (2020) (citing *State v. Davis*, 306 Kan. 400, 417, 394 P.3d 817 [2017]); see also *State v. Garcia*, 297 Kan. 182, 188, 301 P.3d 658 (2013) ("These factors, even if established as true, do not necessarily conclusively establish that the confession was involuntary.").

> "'These factors are not to be weighed against one another with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.' [Citation omitted.]" *Mattox*, 305 Kan. at 1043.

Analysis of this issue requires the court to review the facts surrounding Kellner's inculpatory statements during his interrogations. Kellner was taken to the CAC in the back of a police car and the detective confirmed that the police car door was probably locked. Once inside the CAC, the detective testified that Kellner was brought directly to

8

an interview room, which locks the person inside, and the police interrogation started at about 11:00 p.m. The video recording of the interrogation was admitted into evidence and shows that prior to questioning, Kellner denied having consumed illegal drugs or alcohol within the previous 24 hours but said he had taken ibuprofen and Nyquil or Dayquil due to a cold. He stated that he had attention deficit hyperactivity disorder (ADHD), that "I've had special ed," that he had slept the previous night from 8:30 p.m. until 4:00 a.m. and confirmed that he understood the questions being asked. However, when asked, Kellner could not recall his children's birthdays and said, "My brain is just not, I'm trying to figure out what's going on, trying to process why I'm here and what is going on in my world right now and so my brain isn't where it needs to be."

After gathering initial information from Kellner, at approximately 11:20 p.m., the detective notified Kellner they wanted to talk to him about a report that had been made and said "because you're sitting down here in a room at a police station I'm going to go over your rights so you're aware of what your rights are . . . and then once we get to that if you want to talk to me then we'll get into why we're here, okay." The detective gave Kellner a paper copy of his *Miranda* rights individually listed and a pen, then read through each right one at a time and asked Kellner each time whether he understood the right. Kellner verbally acknowledged that he understood his rights and initialed each line. The detective also explained that "you can decide at any time to exercise these rights and not answer any questions or make any statements" and Kellner said he understood that right. The detective then asked Kellner if he wanted to talk. Kellner paused for several seconds and responded, "I'd just like to know what's going on." He then paused again for about 20 seconds and eventually said "Yeah." Kellner signed and dated the *Miranda* form, demonstrating he was willing to talk to the police at that time.

Before any questioning, Kellner knew that he was at the police station related to a report from his wife. The detective had explained that "a lot of times reports are made and, you know, we get a small piece of the puzzle … we won't know the full story until

9

we talk to you about it." Kellner later said "I wish my wife would just talk to me. She just leaves and goes [to] Walmart and calls the cops on her husband." The detective then said, " you know obviously a report was made tonight, um, saying some things had happened, you know, earlier today or last night . . . ."

Throughout the interview, Kellner talked about his home life, work schedule, the home layout, where his kids sleep in the home, and how he feels like his life just consists of work and sleep and that he and his wife had been arguing. Kellner offered random information about his life—chaos with the kids, lack of money, and accused his wife of "planting things into [the kids'] heads." Eventually, the detective asked Kellner if he was having a hard time communicating, and Kellner responded "Oh, I'm ADHD so I mean. . . . My mind breaks down into like a thousand different things." The detective tried to redirect Kellner to the victim's allegations, but Kellner was reluctant to talk about the allegations.

*Kellner's Inculpatory Statements*

The detective suggested that perhaps Kellner put the victim in her bed and his "mind slipped to a place it shouldn't have been for a minute" and that the victim described it in a way to indicate that Kellner "realized what's going on isn't right and it stopped." In response, Kellner said, "That's all I could think about at work today," and the detective asked if Kellner was referring to "what happened last night." Kellner then asked, "Have you ever had those moments where you just wish you could beat yourself up?" Kellner explained that he was "scared" because the detective had "the power to essentially ruin my life," and said that the detective had "the power to take something that's not in family history, it's not, it's not in my upbringing." When the detective again asked what happened with the victim, Kellner stated that his wife watches crime shows so he has "seen how all this ends," that he would not be allowed to leave, and "if I keep going forward that's exactly where I'm going to end."

10

When the detective asked if Kellner laid down in the bed with the victim after he brought her downstairs Kellner replied, "Well I'm beat, I'm tired." The detective said, "You're not saying no." Kellner then stated that he was tired and "running on hardly any sleep." He then said, "But I did not have a relationship with [the victim]," to which the detective said that the victim was not describing that but was "describing something very close to that." That is when Kellner said, "I may have rubbed up against her" with a "hard on."

After Kellner confirmed that he had an erection while lying next to the victim, the detective asked a series of questions about how Kellner's penis became exposed during that time. Kellner then said, "I did make a mistake," "It's crazy, one hour of my life," and "It's not even one hour it's more like thirty minutes of my life." Kellner denied ejaculating while with the victim and explained that he went back to his room and ejaculated "[b]ecause who I really wanted to be with was my wife." The detective asked what part of the victim touched Kellner's penis and he said, "Between her legs man." Kellner eventually explained that the victim said she loved him, and "[m]aybe what turned me on is the fact that [the victim] actually loved me." He had previously stated that "[i]t was being close to her and just knowing that somebody loved you." Kellner said, "the fact that it feels like somebody else obviously loves you or shows affection to you that your wife is not showing you." Kellner stated twice that "I gave the wrong affection to the wrong person," and that "it wasn't planned" and "it was a mistake." He explained that his actions mimicked "something I saw on the video" showing a Japanese father with his daughter.

At approximately 1:40 a.m., the detective left and Kellner was given a smoke break. As the detective was leaving the room, Kellner said, "My life is going to be ruined by one mistake," to which the detective replied, "That isn't up to me." The detective returned at 2:22 a.m. and asked if Kellner would consent to a search of his phone. Kellner expressed concern that he had made a bad choice, and that he did not "have legal representation here, I don't know nothing about any of this process" and that "I can tell

11

you now it never ends well." The detective repeatedly asked Kellner to make a decision about the phone, and told Kellner he could refuse. Kellner never responded so the detective took his refusal to respond to be a no, and concluded the interview. When Kellner asked the detective what he was supposed to do, the detective responded, "That's not an answer I can give you." The detective eventually notified Kellner he would be going to jail, and the evidence would be submitted to the district attorney's office. The interview concluded at approximately 2:30 a.m.

*The State's Jackson v. Denno Hearing*

At the State's request and before the trial began, the district court held a hearing to determine whether Kellner's interview statements were voluntarily made under the totality of the circumstances. The district court found that Kellner's mental state supported a finding of voluntariness because Kellner was able to understand and respond to the detective's questions appropriately and did not appear to be under the influence, though he was tired and veered off topic several times. Regarding the manner and duration of the interview, the court noted that Kellner was not under arrest or handcuffed, he was given water and a smoke break, he was offered food, and the interview was not particularly lengthy, which supported a finding of voluntariness. However, the interview was late at night, Kellner was tired, he was driven to the CAC in a police car, was escorted inside by an officer, and was then locked inside an interrogation room. The court explained that the detective acted fairly in conducting the interrogation, weighing in favor of voluntariness, as evidenced by the lack of threats or promises used, that the detective did not raise his voice and accommodated Kellner's tendency to go off topic. The court found Kellner's age and intellect also indicated voluntariness, though it did not describe its reasoning. The audio recording of the interrogation was admitted as evidence at trial.

12

*Kellner's Mental State*

Kellner claims that his mental state weighs in favor of finding his statements involuntary because his ADHD, undiagnosed bipolar disorder, anxiety, and tiredness during the interview made it difficult for him to understand and communicate. He also alleges that the detective implied that it would be in Kellner's best interest to confess, and that a competency evaluation showed that Kellner needed things explained to him slowly. The video and transcript of Kellner's interview clearly demonstrate that he had difficulty staying focused, staying on topic, and appropriately responding to prompts from the detective. Though Kellner's lack of focus could relate to his ADHD or other mental conditions, it could also be viewed as his desire to evade the topic. He verbalized his thoughts, answered direct questions, said he was worried about the consequences of his statements, and clearly understood the questions and reason they were being asked. Much of Kellner's off-topic discussion includes shifting blame to his wife and lengthy explanations or excuses for his behavior—demonstrating that Kellner understood the detective's questions and why he was being interviewed. Kellner also made several statements demonstrating that he understood the detective was attempting to get Kellner to inculpate himself and that disclosure could lead to Kellner facing legal consequences. Although it is likely that Kellner was tired, he did not request to cease questioning but in fact continued talking and offering information for the entire interview. There is substantial competent evidence supporting the district court's determination that Kellner's mental state did not render his statements involuntary. See *Lowery*, 308 Kan. at 1222-23 (declining to reweigh the evidence where the court found he was "'responsive'" to questioning and not impaired by a lack of sleep or possible head injury).

*The Manner and Duration of the Interview*

Kellner was unrestrained during the interrogation, had access to water, was given a break to smoke, and the interrogation was relatively short, lasting less than three and a

13

half hours including breaks. Additionally, the interviewing detective remained calm throughout: he did not raise his voice, did not act physically imposing, did not threaten Kellner, and did not engage in deception. Moreover, Kellner began making statements indicating knowledge of wrongdoing within an hour and a half. Although the interview occurred late at night and into the early morning hours, the totality of the interview demonstrates that the late hour did not impact the manner of the interview in such a way as to make Kellner's statements involuntary. See e.g., *Mattox*, 305 Kan. at 1045 (finding statements voluntary when the interviewer remained calm, the interrogation was about three hours long, and the defendant began confessing shortly after the start of the interrogation).

Kellner claims that he was denied requests to communicate with the outside world, specifically that he was denied the ability to speak to his wife, who was his primary support, which made his statements involuntary. "While isolation from the outside world can be a factor in making an interrogation coercive, it is to be expected that police will take steps to limit the ability of potential witnesses and suspects to communicate and, potentially, conspire during an investigation." *Walker*, 283 Kan. at 598. Additionally, denial of a request to contact the outside world is not coercive where the defendant's request "suggest[ed] his motivation for seeking outside contact was to gather information and, in turn, explains the police officers' reluctance to grant his request." 283 Kan. at 598. Kellner knew that his wife called the police, and Kellner indicated that is why he wanted to talk to her. Kellner wanted information from his wife about the investigation and allegations, and the detectives very reasonably denied his request to speak to her. See 283 Kan. at 598.

*Kellner's Age, Intellect, and Background*

On appeal, Kellner argues that his age, intellect, and background do not support a finding that his statements were voluntary under the circumstances. Although Kellner

14

completed high school, took some technical classes at a community college, and maintained employment, he claims that he also took special education courses "throughout his life." Although Kellner had ADHD and some special education courses, a social worker who assessed his competency to stand trial found him of average intellect. At the time of interrogation, he was 34 years old, had attended "some college," worked as a diesel tech and had an employment history. Moreover, during the interrogation, Kellner appeared to understand why he was there and why he was being asked the questions, and the interrogators did not deceive him about the available evidence. Substantial competent evidence supports the district court's finding that, under the totality of the circumstances, Kellner's age, intellect, and background demonstrate he made voluntary statements to police officers.

*Fairness of Interrogation Techniques*

Kellner next argues the detective acted unfairly in conducting the interrogation by telling Kellner the outcome would be better for him if he told the truth. He refers to the detective's statement that "'when it's all said and done I can say you know what, Tim made a mistake but he owned up to it,'" and that "'if we can talk about why that happened and if it's just a, a lapse in judgment that something happened for a moment that should not have happened, let's talk about that.'" Unlike other cases where interrogators have promised or threatened outcomes related to the interrogee's statements—here, the detective did not cross that line. The detective's statements are general advice about how Kellner's actions and willingness to be truthful could be viewed by the detective. "'[M]ere advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent.'" *State v. Farmer*, 285 Kan. 541, 554, 175 P.3d 221 (2008) (quoting *State v. Kornstett*, 62 Kan. 221, 227, 61 P. 805 [1900], wherein a police officer told a defendant he would feel better if he told the truth). The detective did not threaten worse treatment or promise benefits related to Kellner talking.

15

Moreover, the detective explicitly said he could not make Kellner any guarantees or promises about the outcome, and Kellner acknowledged he understood. Kellner said that his fear of repercussions was keeping him from talking freely and said, "The only way I can talk about it then is if you tell me what they're going to do to me." The detective replied that "when I'm done talking to you I'm going to talk to my supervisor and a decision is going to be made." When Kellner expressed concern about what would be done to him, the detective responded by saying, "I'm not going to do anything to you. Okay. But we need to talk about this." Lastly, Kellner stated, "I don't know what's going to happen to me man," and the detective replied that he didn't know what was going to happen to Kellner but that he had seen cases go "all which ways." The detective avoided promising Kellner leniency or a change in circumstance that could result from Kellner's statements, which does not tend to show coercion. See *State v. Swanigan*, 279 Kan. 18, 39, 106 P.3d 39 (2005) (finding threats of specific charges or increased penalty under the other circumstances of the interrogation showed the statements were not voluntary).

Kellner also claims that the detective's faux empathy and claims of helping effectively diluted the *Miranda* warning by decreasing Kellner's understanding that the detective was an adversary. However, Kellner's own statements during the interrogation undermine his assertion on appeal. Kellner told the detective "I know exactly what your job is," and that he had seen crime shows and knows "exactly how this works." Kellner also said that that he understood "[y]ou're not going to let me walk out of this place." He also expressed that talking to the detective could "essentially ruin my life." Nothing about Kellner's actions during the interrogation, his age, experience, or relationship with the interrogating officer demonstrated that he believed the detective was acting as anything other than a legal authority investigating a report of wrongdoing.

The totality of the circumstances, including the manner and duration of the interrogation, Kellner's intellect and age, his inability to communicate with his wife, and the fairness of the interrogation techniques, demonstrate that Kellner's will was not

overborne and that his statements were freely and voluntarily made. See *Mattox*, 305 Kan. at 1042-43. The district court did not err in admitting Kellner's statements at trial.

## II. THE DISTRICT COURT DID NOT ERR IN FINDING KELLNER WAIVED HIS *MIRANDA* RIGHTS

Kellner next argues that he did not voluntarily, knowingly, and intelligently—either expressly or implicitly—waive his right to remain silent during the interrogation.

The Fifth Amendment to the United States Constitution affords individuals the right to not be compelled to incriminate themselves. See e.g. *Miranda v. Arizona*, 384 U.S. at 439. This privilege provides that "statements stemming from custodial interrogation must be excluded unless the State demonstrates it used procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination." *State v. Regelman*, 309 Kan. 52, 59, 430 P.3d 946 (2018). However, once alerted to their rights, a suspect may waive those rights and inculpate themselves. "If a defendant voluntarily waives *Miranda* rights, any subsequent inculpatory statement must still be voluntarily given." *Khalil-Alsalaami v. State*, 313 Kan. 472, 500, 486 P.3d 1216 (2021). This waiver may be explicit or implicit.

A suspect may waive their *Miranda* privileges, either explicitly or implicitly, and law enforcement is not required to follow a specific, step-by-step procedure to obtain such waiver. *State v. Parker*, 311 Kan. 255, 258-59 (2020) (discussing methods and requirements for obtaining waiver of Miranda privileges); *State v. Kirtdoll*, 281 Kan. 1138, 1144, 136 P.3d 417 (2006) (finding *Miranda* waiver may be implicit or explicit). This court reviews de novo whether a defendant voluntarily waived *Miranda* rights under a totality of the circumstances. *Kirtdoll*, 281 Kan. at 1144. Typically, whether a defendant's statements to law enforcement were voluntarily made—as discussed above—is a separate determination from whether the defendant waived their Miranda rights. *Khalil-Alsalaami*, 313 Kan. at 500; see also *Mattox*, 280 Kan. at 483. However, when as

17

here the waiver is arguably implicit, "the issue of whether the defendant waived his or her *Miranda* rights can be virtually indistinguishable from the issue of whether the defendant's statement was voluntary." *Mattox*, 280 Kan. at 483.

The totality of the circumstances demonstrates that Kellner knowingly, voluntarily, and intelligently waived—whether explicitly or implicitly—his right to remain silent. The detective told Kellner that he wanted to talk to Kellner about a report that was made to learn the whole story. He explained that because Kellner was sitting in a police station, he wanted to go over Kellner's rights so that Kellner was "aware of what [his] rights are." He then read through each right, asked Kellner if he understood them, and asked Kellner to initial if he understood the rights. This list of rights included Kellner's right to decide at any time to invoke his right to remain silent and not answer any questions or make any statements, his right to speak to a lawyer, or have a lawyer appointed—all of which Kellner acknowledged. Kellner verbally answered that he understood each right. The detective then asked, "[H]aving these rights in mind do you wish to talk to me now?" After a short pause, and expressing his desire to speak to his wife, Kellner eventually said, "[Y]eah" and signed and dated the form that he agreed to waive his rights. There can be few more explicit acts to demonstrate waiver. Kellner did not say he was confused about his rights, did not ask questions about the *Miranda* rights when they were explained, and never expressed his desire to exercise them at any time later in the interrogation.

Although the detective did not fully explain the underlying reason for administering Kellner's *Miranda* rights or the possible consequences of the interrogation, this lack of disclosure was not deceptive and was not required. This court has reviewed many interrogations where officers openly explained that the *Miranda* rights were being provided because the accused was facing possible criminal charges, and still the accused voluntarily waived their rights and made inculpatory statements. Although that scenario is preferred, officers are not required to rise to that level of disclosure. See e.g., *Parker*,

311 Kan. at 258-59 (finding that officers met the minimum requirements by giving the accused a written copy of his *Miranda* rights and reading the rights aloud even though they did not ask if he understood the rights). While the reason for giving Kellner his Miranda rights could have been more thorough, the detective did tell Kellner that the police received a report, and the detective wanted to ask him questions related to that report. Kellner also knew that his wife had called the police and that—as he expressed during the interrogation—police investigate crimes and talking to them could have significant consequences. The detective did not deceive Kellner about the reason for the detective's questions or the reason for the *Miranda* rights.

The detective read Kellner each Miranda right, asked if he understood them, allowed Kellner to initial his understanding, and then asked Kellner if he wished to waive the rights and talk to the detective. Under the totality of these circumstances, Kellner expressly and knowingly waived his *Miranda* rights and voluntarily talked to the detective. Even if Kellner's waiver were insufficient to be explicit, his actions also demonstrate an implicit waiver. When, as here, there is no evidence of coercion, a defendant can implicitly waive their right to remain silent by confirming they understand their rights and engaging in conduct that demonstrates waiver, such as talking. *Kirtdoll*, 281 Kan. at 1146.

The district court did not err in finding Kellner waived his right to remain silent during the interrogation.

III.  THE STATE DID NOT VIOLATE KELLNER'S RIGHT TO A SPEEDY TRIAL

Kellner claims that the State violated his constitutional right to a speedy trial because his case was pending for two years and ten months before the trial. The Sixth Amendment to the United States Constitution—which is applicable to the states through the Fourteenth Amendment—provides that "the accused shall enjoy the right to a speedy

and public trial." *State v. Owens*, 310 Kan. 865, 869, 451 P.3d 467 (2019); *Klopfer v. State of N.C.*, 386 U.S. 213, 222-23, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). Unlike Kansas's statutory right to speedy trial under K.S.A. 2022 Supp. 22-3402, which provides a specific number of days within which to bring a defendant to trial, the constitutional speedy trial right does not create a strict timeframe. Rather, whether a trial is speedy depends on the circumstances of each case. *State v. Ford*, 316 Kan. 558, 560, 519 P.3d 456, 458 (2022).

This court exercises an unlimited review of Kellner's constitutional speedy trial claim and considers the length of delay, the reason for the delay, the defendant's assertion of his right, and any resulting prejudice to the defendant to determine whether the State violated a defendant's constitutional right to a speedy trial. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); *State v. Shockley*, 314 Kan. 46, 62, 494 P.3d 832 (2021). These factors are considered and weighed against one another, and no one factor is controlling. *State v. Weaver*, 276 Kan. 504, 506, 78 P.3d 397 (2003).

*Length of Delay*

"'The constitutional protection of a speedy trial attaches when one becomes accused and the criminal prosecution begins, usually by either an indictment, an information, or an arrest, whichever first occurs.'" *Ford*, 316 Kan. at 561 (quoting *State v. Rivera*, 277 Kan. 109, 112, 83 P.3d 169 [2004]). Only if the delay is presumptively prejudicial does this court need to inquire further into the analysis. *Weaver*, 276 Kan. at 506. Kellner was charged on February 27, 2019, and his trial began on January 18, 2022—a delay of two years and nearly eleven months.

The United States Supreme Court and Kansas Supreme Court have both found that delays of more than three years triggered examination of the other three factors. See *Barker v. Wingo*, 407 U.S. at 533 (delay of five years); *State v. Dolack*, 216 Kan. 622, 636, 533 P.2d 1282 (1975) (delay of over three years); *State v. Hemminger*, 210 Kan. 587, 594, 502 P.2d 791 (1972) (delay of over four years). Assuming this almost three-year delay is presumptively prejudicial, as did the district court, this court considers the other factors to determine if Kellner's constitutional right to a speedy trial was violated.

*Reason for Delay*

Kellner acknowledges that his trial date was repeatedly delayed to accommodate his three counsel changes, allow a competency evaluation, and due to the COVID-19 pandemic which halted trials for several months. The State did not request any continuances of the trial date. Kellner argues this factor should not weigh against him because the delays were due to "more neutral reason[s]." Although Kellner classifies his requested continuances for trial preparation and a competency evaluation as "neutral," this court disagrees. See *Rivera*, 277 Kan. at 117 (where the court found defendant's requests for continuance to prepare attributable to the defendant).

Here, only one delay is attributable to the State—the time between the October 2019 preliminary hearing and November 2019 jury trial control date. The rest of the continuances were attributable to Kellner to allow him to seek new counsel, allow his new counsel time to prepare, and to allow his counsel to seek a competency evaluation of him. As a result, this factor weights against Kellner.

*Kellner's Assertion of the Right to Speedy Trial*

Although it is the State's obligation to timely bring a defendant to trial, the court can weigh a defendant's efforts to assert their right to a speedy trial. "'[F]ailure to assert

21

the right will make it difficult for the defendant to prove that he was denied a speedy trial.'" *Rivera*, 277 Kan. at 117. Kellner first asserted his right to a speedy trial by filing a pro se motion on November 24, 2021—roughly two years and nine months after the State brought charges against him. His attorney then filed a motion asserting his right to speedy trial on January 8, 2022—shortly before the scheduled trial.

Kellner waited until shortly before trial to assert his right, when little more could be done to speed up the process, and only after repeatedly causing and requesting continuances of the trial date. This factor does not weigh against the State.

*Prejudice to Kellner*

Ultimately, the most important factor in this analysis is whether and to what extent, if any, Kellner was prejudiced by the delay. In analyzing whether the defendant suffered prejudice, this court determines whether the defendant suffered (1) oppressive pretrial incarceration, (2) constitutionally cognizable anxiety, (3) or impairment to the ability to present a defense. *Harris v. Champion*, 15 F.3d 1538, 1559 (10th Cir. 1994). The most important of these factors is the last because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Weaver*, 276 Kan. at 511.

Kellner argues that his liberty was significantly restrained pre-trial for almost three years which also caused him anxiety. Even assuming that the almost three-year pretrial incarceration was oppressive, there is no evidence that Kellner suffered particularized anxiety violative of his constitutional rights. A defendant asserting a cognizable claim for prejudice stemming from anxiety associated with prolonged pretrial incarceration must make a "'particularized and substantial showing of anxiety distinguishable from anxiety suffered by other similarly situated defendants.'" *State v. Hurst*, 62 Kan. App. 2d 614, 623, 521 P.3d 1 (2022) (quoting *State v. Bussart-Savaloja*, 40 Kan. App. 2d 916, 925,

198 P.3d 163 [2008]). Kellner asserts no allegations of particularized anxiety associated with his pretrial incarceration.

Kellner lastly argues that the delay impacted his ability to assert a defense. Kellner claims that the following line of trial testimony where the victim was unable to remember certain details resulted from the trial delay and affected his ability to cross examine her:

"Q.     Okay. And your testimony was that it was like with his arm or his hand?
"A.     Yes.
"Q.     Okay. Do you know if there was like a towel or some sort of clothing or something that maybe was in his hands?
"A.     No.
"Q.     You don't know, or you - -
"A.     *I don't know.*
"Q.     Pardon me?
"A.     *I don't really know.*
. . .
"Q.     Okay. Also, do you remember back in that timeframe liking to sleep with your mom?
"A.     Sometimes.
"Q.     And liking to sleep with your dad sometimes?
"A.     *I don't remember that.*
"Q.     Okay. How about sleeping with your sister?
"A.     Yes, I remember that."

While the victim testified that she did not recall facts related to a couple of questions, such responses are not abnormal nor are they necessarily attributable to the delay in trial. The victim was young—under age seven—at the time of the incident and still young at the time of trial which makes it understandable that she may not recall details from her childhood. Moreover, Kellner fails to show how the victim's memory lapses as to these facts impeded his defense. The victim's memory as to these facts is not

23

exculpatory, and if she had recalled in the negative as to either question, her testimony could have been worse for the defendant. This court cannot guess or assume how Kellner believes the victim's inability to recall in the cited circumstances hurt his ability to form a defense. Nor has he shown that the victim at such a young age would have recalled more as to these questions in a manner that would have helped his case had the trial proceeded earlier.

Here, the prejudice factors weigh heavily in favor of the State. Although the delay in the trial date was presumptively prejudicial, Kellner ultimately did not suffer any prejudice from that delay that violated his constitutional rights. Kellner caused, created, or requested most of the delays, he failed to assert his right to speedy trial until shortly before trial, and he failed to show that he was prejudiced by the delay.

IV.    THERE WAS SUFFICIENT EVIDENCE THAT KELLNER TOUCHED THE MINOR VICTIM WITH THE INTENT TO AROUSE OR SATISFY SEXUAL DESIRES

Kellner claims the State failed to prove that his lewd touching of the victim was "done with" the intent to arouse or satisfy sexual desires, and thus the State failed to prove he violated the aggravated indecent liberties with a child statute. The aggravated indecent liberties with a child statute under which Kellner was convicted provides that:

> "(b) Aggravated indecent liberties with a child is:
> ". . .
> "(3) engaging in any of the following acts with a child who is under 14 years of age:
> "(A) Any *lewd fondling or touching of the person of either the child or the offender*, done or submitted to *with the intent to arouse or to satisfy the sexual desires* of either the child or the offender, or both." K.S.A. 2018 Supp. 21-5506(b)(3)(A).

Kellner argues that "[a] person might engage in lewd touching for other reasons or for no reason and might separately have an intent to arouse or satisfy sexual desires." He claims,

24

"The record is devoid of any evidence from which a reasonable jury could infer that any touching in this case was done with the intent to arouse or satisfy sexual desires." He does not claim that he was not sexually aroused, but claims the lewd touching was not what caused his arousal but that he was aroused because the victim said she loved him, and then he satisfied his sexual desire away from the victim.

This court reviews a challenge to the sufficiency of the evidence by reviewing the evidence in the most favorable light to the State "to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt" without reweighing the credibility of the evidence. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). This is a high burden, and this court will not reverse a guilty verdict without finding the evidence "so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

Kellner fails to present evidence to meet this high burden. Although Kellner did not admit his intent in touching the victim, that is not required. "Intent is usually proven by inference arising from circumstantial evidence because direct evidence of a defendant's state of mind is rarely available." *State v. Gonzalez*, 311 Kan. 281, 288, 460 P.3d 348 (2020). Circumstantial evidence is sufficient to support even the most serious conviction even when it does not exclude every other possible conclusion. *State v. Colson*, 312 Kan. 739, 750, 480 P.3d 167 (2021); *State v. Pattillo*, 311 Kan. 995, 1003, 469 P.3d 1250 (2020).

Kellner told the detective that "[m]aybe what turned me on is the fact that [the victim] actually loved me" and told him "I love you . . . ." Kellner told the detective that while he was putting his penis between the victim's legs (like what he saw in the video he watched on his phone) "who I really wanted to be with was my wife. I wanted to be close to my wife." The evidence presented at trial was that seminal fluid consistent with Kellner's DNA profile was found on the victim's labia and the KBI forensic scientist

25

testified that there "needs to be some sort of stimulation and release in order for seminal fluid to be present." In closing, Kellner's counsel argued that the victim's description was consistent with Kellner cleaning her after she wet the bed, that the detective acknowledged to Kellner that he did not believe Kellner's actions were intentional, and that Kellner would not have left the victim after getting an erection if he wished to satisfy his sexual desires with her.

The evidence most favorable to the State is sufficient for a reasonable fact-finder to infer that Kellner lewdly touched the victim with the intent to arouse or satisfy his sexual desire and thus find him guilty of aggravated indecent liberties with a child beyond a reasonable doubt.

V.    THE JURY INSTRUCTION CONTAINED THE ESSENTIAL ELEMENTS OF AGGRAVATED INDECENT LIBERTIES WITH A CHILD

The parties agreed, without objection from Kellner, to use the standard PIK Crim. 4th 55.121 (2016 Supp.) jury instruction language for the aggravated indecent liberties with a child charges. The jury instruction stated:

"INSTRUCTION 6
"In count one, the defendant is charged with aggravated indecent liberties with a child. The defendant pleads not guilty.
"To establish this charge, each of the following claims must be proved:
"1. The defendant engaged in lewd fondling or touching of [the victim].
"2. The defendant intended to arouse or satisfy the sexual desires of the defendant.
"3. At the time of the act, [the victim] was less than 14 years old.
"4. The defendant was 18 or more years old at the time the act occurred.
"5. This act occurred on or between the 21st day of February, 2019 and the 22nd day of February, 2019 in Sedgwick County, Kansas.

26

"'Lewd fondling or touching' means fondling or touching in a manner which tends to undermine the morals of a child and is so clearly offensive as to outrage the moral senses of a reasonable person. Lewd fondling or touching does not require contact with the sex organ of one or the other.

"The State must prove that the defendant committed the crime intentionally. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State."

The elements of the instruction and definition of "lewd fondling or touching" are consistent with the PIK Crim. 4th 55.121. The last paragraph, describing the mens rea of intent, is consistent with the culpable mental state instruction in PIK Crim. 4th 52.010 (2021 Supp.).

Kellner argues for the first time on appeal that the provided jury instruction failed to connect the element of lewd fondling with the element of arousal or sexual desire and thus misstated the law. This court evaluates alleged jury instruction errors using a three-step process to determine whether (1) there is appellate jurisdiction; (2) error occurred; and (3) any identified errors require reversal. Whether the defendant preserved their claim for appeal at step one impacts any reversibility inquiry at step three. Before evaluating reversibility, this court must determine whether the jury instruction was legally and factually appropriate applying a de novo standard. *State v. Holley*, 313 Kan. 249, 253-54, 485 P.3d 614 (2021).

*Step One:  Kellner Failed to Object to the Jury Instruction at Trial*

It is undisputed that Kellner failed to object to the provided jury instruction before the district court. In fact, his attorney stated, "I think that elements of the offense are listed." Kellner's failure to preserve this issue by objecting at trial does not prohibit its appellate review but rather changes the review standard. *Holley*, 313 Kan. at 254. This

court reviews the unpreserved claim of jury instruction error for clear error. K.S.A. 2022 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). A jury instruction is clearly erroneous if it is legally or factually inappropriate and the appellate court is firmly convinced the jury would have reached a different verdict if the erroneous instruction had not been given. The party claiming clear error has the burden to show both error and prejudice. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

*Step Two: The Provided Jury Instruction Was Legally And Factually Appropriate*

This court evaluates jury instruction error by determining if it was legally and factually appropriate. An instruction is legally appropriate if it fairly and accurately states the applicable law. *State v. Kleypas*, 305 Kan. 224, 302, 382 P.3d 373 (2016). The jury instruction is factually appropriate if it is "supported by the particular facts of the case at bar." *State v. Plummer,* 295 Kan. 156, 161, 283 P.3d 202 (2012). In evaluating whether an instruction is factually appropriate, courts must determine whether there was sufficient favorable evidence to the defendant to support the instruction. *Holley*, 313 Kan. at 255.

The jury instructions were taken from and matched the PIK instruction for aggravated indecent liberties with a child, including the elements and definition of "lewd fondling or touching." PIK Crim. 4th 55.121. The last paragraph, describing the mens rea of intent, was consistent with the culpable mental state instruction in PIK Crim. 4th 52.010. As was done in this case, the Kansas Supreme Court "'strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions.'" *State v. Butler*, 307 Kan. 831, 847, 416 P.3d 116 (2018).

28

A "trial court has the duty to inform the jury of every essential element of the crime that is charged" by using the language of the statute or other appropriate and accurate language. *State v. Richardson*, 290 Kan. 176, 181, 224 P.3d 553 (2010). The jury instruction given matched the PIK and the statutory language of the offense, which provides "[a]ny *lewd fondling or touching of the person of either the child or the offender*, done or submitted to *with the intent to arouse or to satisfy the sexual desires* of either the child or the offender, or both." K.S.A. 2018 Supp. 21-5506(b)(3)(A). The jury instruction given included each essential element of the crime.

Kellner argues that the phrase "done with" should be considered an essential element of the crime because it connects Kellner's intent of arousal or satisfying sexual desire to the act of lewd touching. Although perhaps an interesting intellectual exercise, this argument lacks merit in law and fact. The jury instruction contained the essential element of the act followed by the essential element of the intent. A natural reading of the instruction connects the act with the intent. In fact, if Kellner had merely desired to be sexually aroused or satisfy sexual desire, but had not lewdly touched the victim then there would not be sufficient evidence to support a conviction for aggravated indecent liberties with a child. Additionally, the jury instruction explained that "[t]he State must prove that the defendant committed the crime intentionally," which means the defendant had the "desire or conscious objective to do the act" which further connected the act of lewd touching to the required intent.

Kellner also argues that the instruction was factually inappropriate because at trial he argued that his erection occurred before he laid the victim down; that he may have bumped against her with his erection; and he later got out of her bed to watch pornography. So, Kellner apparently attempted to assert that he was aroused and/or satisfied his sexual desire both before and after lewdly touching the victim but the arousal and/or sexual desire were wholly unrelated to the intervening lewd touching. He argues, therefore, that inclusion of the was "done with" language would have been factually

29

appropriate because the jury could have found that his lewd touching of the victim was not "done with" the requisite intent even though he was simultaneously sexually aroused and did contemporaneously satisfy his sexual desire.

Kellner attempts to argue on appeal that the instruction could be read to find a defendant guilty after engaging in lewd fondling or touching while contemporaneously intending to arouse or satisfy their sexual desires from unrelated acts. Such a circumstance is difficult to imagine and was not presented in this case. The facts of this case readily and easily connected Kellner's arousal to his lewd touching of the victim because Kellner admitted the victim's statement to him began his arousal that evening and that he had watched a pornographic video that matched the allegations of his lewd touching. Then, shortly after the lewd touching, he completed the physical release of his arousal. There are no facts in this case demonstrating that Kellner engaged in lewd touching separate and unrelated to his intent to arouse or satisfy his sexual desire.

There are other pattern jury instructions with separate illegal acts and requisite intent that use connective language to relate the act and intent. See, *e.g.*, PIK Crim. 4th 55.090 (2021 Supp.) (requiring the State to prove the defendant "touched" the victim, and that "touching was done with the intent" to arouse or satisfy sexual desires); PIK Crim. 4th 55.181 (2017 Supp.) (requiring the State to prove the defendant possessed a type of visual depiction and "did so" with the requisite intent). While adding the "done with" language would have been both legally and factually appropriate, its omission was not factually or legally inappropriate. The aggravated indecent liberties with a child jury instruction, including definitions, naturally connected the essential elements of the act and intent even without the "done with" language, which fairly and accurately states the law and is supported by the case facts. Just because a jury instruction could be better, clearer, or more complete does not make it factually or legally inappropriate or inaccurate. There was no error.

30

*Step Three:  The Error Was Not Clearly Erroneous*

Even assuming an error occurred, Kellner is not entitled to reversal of his conviction unless he can show the instruction was clearly erroneous and the jury would have reached a different verdict absent the erroneous instruction. K.S.A. 2022 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."); *Crosby*, 312 Kan. at 639. Kellner bears this heightened burden because he failed to object to the jury instruction at trial and thus deprived the district court of an opportunity to avoid the alleged error and present the jury with an instruction that more clearly connected the act with the intent.

As explained previously, there was ample evidence that Kellner engaged in lewd fondling or touching of the victim with the intent to arouse or satisfy his sexual desires. Seminal fluid consistent with Kellner's DNA was found on the victim's labia; Kellner admitted to the detective that he rubbed his penis between the victim's legs imitating a video he saw and that he regretted the action; Kellner stated that he became aroused by the victim's statement of love which occurred just before he touched her with his penis; and the forensic scientist testified that seminal fluid is present in pre-ejaculate or ejaculate and that "stimulation and release" is needed for seminal fluid to be present. Kellner presented no evidence that he was not intending to be aroused or satisfy sexual desire when he lewdly touched the victim. His only evidence that his arousal or satisfaction of sexual desire was not related to the lewd touching of the victim is that he left the room before completing his masturbatory act, and perhaps that he wished he was touching his wife when touching the victim.

There is no evidence that convinces this court that the jury would have reached a different result had the jury instruction more clearly connected the actus reus:  Kellner's

31

lewd touching of the victim, with the means rea, Kellner's intent to arouse or satisfy his sexual desire. To be clear, the instruction was not erroneous, and this analysis is provided simply for completeness. But even assuming the provided jury instruction was not legally or factually appropriate, it was not clearly erroneous.

## VI. KELLNER'S RIGHT TO A FAIR TRIAL WAS NOT AFFECTED BY PROSECUTORIAL ERROR

Kellner asserts that during closing argument, the prosecutor made several "we know" statements, provided his opinion, and misstated the law, cumulatively creating reversible error. This court evaluates claims of prosecutorial misconduct in two steps to determine whether an error occurred and then determining if the identified error prejudiced the defendant's right to a fair trial. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). An error occurs when this court finds that "the prosecutor's comments fall outside the wide latitude afforded prosecutors" and offends the defendant's rights. *State v. Alfaro-Valleda*, 314 Kan. 526, 538, 502 P.3d 66 (2022). If such an error occurred, this court must then determine if that error prejudiced the defendant. 314 Kan. at 538. When both constitutional and nonconstitutional prosecutorial errors have occurred, an appellate court applies the constitutional harmless standard to determine whether the State can demonstrate beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record. *Sherman*, 305 Kan. at 100 (citing *State v. Ward*, 292 Kan. 541, Syl ¶ 6, 256 P.3d 801 [2011]).

*The Prosecutor's "We know" Statements*

First, Kellner argues the prosecutor erred in making the following "we know" statements regarding allegedly disputed facts:

1. "So let's walk through the timeline. *We know* how the disclosure happened based on the evidence. This is the evidence of what happened. [The victim] goes to sleep. [The

victim] goes to school. When she gets home from school, [the mom's friend] is over there with her mom. And she tells her: 'Daddy touched my butt.'"

2. "And *what do we also know* from the DNA? We know that seminal fluid was found on [the victim]. Now you can debate whether you believe that's pre-ejaculate or ejaculation. The defendant told Detective Ribble he did not ejaculate. Nevertheless, seminal fluid comes from a male, undisputed. It's on [the victim]. That's what the evidence shows. The DNA—this man, the defendant."

3. "And remember, pornography in itself is not the issue here. It's not illegal to view it. Adult pornography, it's not the issue. It's reliving a sexual fantasy with a child that is illegal. That's the focus here. And *we know* from the sperm found in that seminal fluid what he wanted to accomplish, that he had to go elsewhere to finish."

4. "I will submit to you, the evidence tells you very clearly this wasn't a mistake. This wasn't an accident. He made a decision. He intended to gratify himself sexually. He may not have completed the entire mission, but that's what his intent was when he touched her, and that's what the law requires the State to prove.

   "*How do we know that*? How do you know that? Look at his words again, his consciousness. The struggles he goes through in that interview with Detective Ribble."

A prosecutor's use of "we know" statements in closing argument can lead to error when those statements are used "in the context of making inferences for the jury because that use convey[s] the prosecutor's opinion, which is irrelevant." *Alfaro-Valleda*, 314 Kan. at 538. The use of "we know" statements related to disputed or controverted facts or to draw conclusions or inferences creates a risk of the prosecutor's opinion—even if based on reasonable inference—being presented as evidence to the jury. However, the "use of a 'we know' statement is not prosecutorial error when the evidence being discussed is not controverted." 314 Kan. at 538.

33

Although he alleges the prosecutor's "we know" statements concerned controverted facts, Kellner fails to identify how the statements are controverted. The first "we know" statement—that "[w]e know how the disclosure happened"— was an uncontroverted fact. The victim's mom testified as to the disclosure, and there was no evidence to controvert its occurrence. Kellner attempted to elicit testimony from the victim's mom that the disclosure was nonchalant but did not contest its occurrence.

The second statement regarding the presence of seminal fluid with DNA matching Kellner was controverted. Although Kellner did not present his own expert, his attorney attempted to elicit testimony from the State's expert to draw the DNA and presence of seminal fluid into question. Whether Kellner succeeded in drawing the KBI expert's testimony into question is a matter of weight for the jury to decide. *State v. Burton*, 35 Kan. App. 2d 876, 882, 136 P.3d 945 (2006) ("It is the jury's prerogative to decide the credibility of witnesses, the weight to be given evidence, and the reasonable inferences to be drawn from the evidence."). Therefore, the prosecutor's use of "we know" statements drawing inferences from the DNA evidence—no matter how reasonable—was an error.

The third and fourth statements—regarding evidence of Kellner's intent to gratify himself sexually—also referenced a controverted fact. Kellner denied ejaculating or leaving seminal fluid on the victim. The prosecutor discussed Kellner's demeanor in the interview and his statements from which the jury could infer Kellner's intent, which exceeds the prosecutor's wide latitude. "A prosecutor inferring from evidence and adding that 'we know' the inference is valid crosses the line by giving the prosecutor's opinion about the strength and meaning of the evidence." *Alfaro-Valleda*, 314 Kan. at 540.

Three of the "we know" statements Kellner points to constitute error as they referred to controverted facts, but that is not the end of the inquiry.

34

*The Prosecutor's Personal Opinion*

Kellner next argues that the prosecutor erroneously inserted his personal opinion into the argument by stating:

"He talks about where he put his penis. The swabs of the DNA show you how lewd it was, because there's seminal fluid there. Remember, there's bruising. Use your common sense. If rubbing against a little girl for 30 minutes with your erection, is that causing any type of injury? You could say: But it could have been anything. It could have been a bicycle accident. *I'm not going to believe that.* The seminal fluid is not from a bicycle accident. It's from his penis."

As Kellner alleges, the prosecutor stating his opinion that the victim's labia bruising could not have been caused from a source other than Kellner is prosecutorial error. The prosecutor's opinion statement goes beyond reciting the evidence to create an inference for the jury to draw, and inappropriately completes the inferential loop. *State v. Pribble*, 304 Kan. 824, 835, 375 P.3d 966 (2016) (arguing the evidence contradicts the defendant's testimony is acceptable, but a prosecutor's statement that they "don't believe" the defendant's statement crosses the line).

*Misstatement of the Law*

Kellner next alleges that the prosecutor misstated the law in closing argument when he said:

"So this is a question that I submit that you need to answer. Did he lewdly fondle or touch her? What does the evidence show you? This is the instruction, the definition of lewd fondling and touching. It's in your packet on both of the counts.

"What you don't see here is whether it's an intentional touching. The intent comes about the sexual motivation. What is his motivation by doing the touching? The definition of what the lewd fondling, touching is about, whether the type and manner in

35

which it occurs would undermine the morals of a child and clearly be offensive to the outrage and moral senses of a reasonable person."

As with his previous argument regarding the jury instruction, Kellner asserts that because the prosecutor's explanation of the charge did not include the phrase "done with" connecting the lewd touching with the arousal or sexual desire intent, the prosecutor's statement was an incorrect recitation of the law.

As previously explained, the prosecutor's statement of the law was not erroneous. First, the prosecutor explained the definition of "lewd fondling or touching" by pointing to the jury instruction. The prosecutor then explained that Kellner's "intent comes about the sexual motivation. What is his motivation by doing the touching?" In making this statement, the prosecutor explained that Kellner's intent must be connected to his lewd touching of the victim. This is an accurate statement of the law. See also *State v. Dinh Loc Ta*, 296 Kan. 230, 242-43, 290 P.3d 652 (2012) (both intent and a lewd touch are necessary to commit aggravated indecent liberties with a child, but the intent does not make every touch lewd).

*Prejudice to Kellner from the Prosecutorial Errors*

After finding four of the prosecutor's statements constitute error, this court must determine if the defendant was prejudiced by those errors by determining whether "there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 305 Kan. at 109. Kellner argues that the State cannot meet this burden because there is no evidence that his lewd touching was "done with" the intent to arouse or satisfy sexual desires.

The court considered several factors to determine harmlessness, including the strength of the evidence, mitigating factors, the prosecutor's statements surrounding the erroneous statements, and the strength of the case. See *State v. Brown*, 316 Kan. 154,

36

172, 513 P.3d 1207 (2022) (requiring analysis of multiple factors because prejudice may be found even in strong cases). Although the State heavily relies on the overwhelming evidence of Kellner's guilt, there is other evidence of harmlessness. First, the district court mitigated potential prejudice to the defendant by instructing the jury prior to closing that the "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they're not evidence. If any statements are made that are not supported by evidence, they should be disregarded." Then again, immediately before the prosecutor's closing argument the judge said, "[a]nd remember . . . that the statements and arguments of counsel are not evidence." Such instructions are intended to ensure that jurors understand the attorneys are advocates for their case, and that their statements do not constitute evidence. Courts assume that jurors understand and follow these instructions, and this type of instruction can be weighed by appellate courts in determining whether a prosecutor's erroneous statements were harmless to the defendant's right to a fair trial. *Brown*, 316 Kan at 170.

Second, the prosecutor made the erroneous "we know" and opinion statements in the context of discussing the evidence supporting those inferences and opinion. Each erroneous statement was made during the prosecutor's initial closing argument—which comprised fourteen transcript pages—and were surrounded by statements of uncontroverted facts. The prosecutor did not make isolated assertions of opinion, and these erroneous inference statements were based on or supported by the uncontroverted facts of the case. For example, the prosecutor's opinion statement about the cause of the victim's labia injury was presented with the evidence of Kellner's inculpatory statements about his actions, the victim's contemporaneous statement, and the DNA evidence. Moreover, the jury was free to disagree with and had been instructed to disregard the prosecutor's opinion statement about the cause of the victim's labia injury. This was not a running theme or repetitive statement but rather an isolated comment within fourteen pages of argument.

Finally, the prosecutor's closing argument demonstrated the strength of the prosecutor's case. Kellner's own inculpatory statements made most of the facts uncontroverted. The victim very quickly reported Kellner's inappropriate touching. The video that inspired Kellner's conduct was located, and the seminal fluid with a DNA profile consistent with Kellner was found on the victim's labia. Given the repeated mitigating statements from the court, the context of the erroneous statements, the number and timing of the erroneous statements in the context of the closing argument, and the strength of the State's case, this court is convinced beyond a reasonable doubt that there is no reasonable possibility that the prosecutor's erroneous statements contributed to the verdict. See *Brown*, 316 Kan. at 170-72 (finding no prejudice from the prosecutor's "we know" statements surrounded with discussions of the evidence that supported the conclusions when the inferences were reasonable and the evidence of guilt strong).

## VII.   CUMULATIVE ERROR DID NOT DEPRIVE KELLNER OF A FAIR TRIAL

Kellner argues that the prosecutor's improper statements during closing and the lack of clarity in the jury instruction—even if individually insufficient to require reversal—constitute cumulative error that was not harmless beyond a reasonable doubt. Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. This court analyzes the cumulative effect of errors similarly to its analysis of each individual error by examining the errors and how the judge dealt with the errors as they arose in context; evaluating the nature and number of errors and whether they are interrelated; and analyzing the overall strength of the evidence. Just as with the individual errors discussed herein, because some of the alleged cumulative errors are constitutional, the State must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome of the trial. *Alfaro-Valleda*, 314 Kan. at 551-52. But the cumulative error analysis does not apply unless

multiple errors have been found. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018).

Kellner successfully showed error only in the prosecutor's statements. Had Kellner shown the jury instruction was factually or legally erroneous—even if it were not clearly erroneous—then it could still be used to evaluate cumulative error to determine if the defendant was deprived of the right to a fair trial. Because he failed to make such a showing, and this court has already evaluated the cumulative effect of the prosecutorial errors, additional inquiry is unnecessary.

VIII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING KELLNER'S MOTION FOR DISPOSITIONAL AND DURATIONAL DEPARTURE

Lastly, Kellner argues that the district court abused its discretion in denying his motion for departure and instead sentencing him to life imprisonment with a minimum of 25 years served. Following trial, Kellner moved for dispositional and durational departure due to: (1) his age, (2) his lack of prior criminal history, (3) mitigating circumstances including his stress, ADHD diagnosis, and addiction which interfered with his normal behavior, (4) his willingness to abide by conditions set by the court including participating in programs for family preservation, and (5) that there was less harm in this case than normally associated with this type of crime.

At sentencing, the court noted that the presentence investigation report (PSI) did not provide a criminal history score because Kellner's crime of conviction was an off-grid person felony. However, because Kellner had filed a motion for departure, the court noted for the record that his history would have been "I," meaning he had no scorable prior convictions pursuant to the grid. At the sentencing hearing, the State recommended a life sentence with a mandatory 25-year minimum, and argued there was no substantial and compelling reason to depart from that statutory sentence. The victim's mother

provided a statement and asked the "Court to take into consideration how much this has, not only broken apart my family, but has created a series of kind of lifelong struggles that we have to now deal with because of the actions that Mr. Kellner chose to take on that evening." The victim's guardian told the court that the victim wanted it "to know that this has all messed up my family and life since it happened."

In support of his motion for departure, Kellner's attorney argued that the legislature used to leave it to families to resolve these types of inter-family issues, but now "there are situations where the legislature feels that the family needs to be completely destroyed and an individual sent to prison for essentially the rest of their life." The attorney suggested that the court could take the opportunity to avoid destroying the family and instead treat sentencing as an "opportunity to repair and rebuild and strengthen the family" because "this is a case where family preservation appears to be wanted by all the parties." He argued the cost to the State for imprisoning Kellner could be better used, and that with supportive services such as counseling, "[w]e could reunite this family and get them back to a healthy place. And that starts with a dispositional departure." The attorney then stated that "it's not that big of a risk" to depart because Kellner would be on lifetime registration and lifetime parole with the underlying threat of returning to prison if he did not follow through. As a result, departing downward and returning back to the grid would be a "win-win situation. It's a win for the family; it's a win for the State."

Kellner's attorney also argued that Kellner had essentially no prior criminal history, there were no allegations of vaginal penetration, no allegations of intercourse, and no allegations of extensive sexual abuse. Rather, "this is far from the worst situation that any of us have ever listened to evidence on, or been presented in a courtroom." Further, the attorney stated Kellner was suffering from "some pressure and some stress, and so forth, that was involved in the family," and may have had an addiction to pornography.

40

Kellner then provided his own statement to the court. He stated that he was a Christian and "[i]n this whole process, I've forgiven everybody in this courtroom—the jury, my own family, and all my coworkers—anybody I've ever come into contact with that I felt was to blame for the reason why my life went the way it went." He eventually concluded by stating that "I love my kids. I love my wife, even to this day, and I forgive her, whether she forgives me or not."

Before ruling, the district court stated that "what happened to that six-year-old . . . is not a family issue. It has never been a family issue. The legislature and people in the state have never turned a blind eye to the sexual abuse of children because it happened within a family." Further, the court stated, "one could argue that nobody involved in this case needs your forgiveness for anything that happened in this case."

The court then went on to consider the mitigating circumstances Kellner presented without weighing them in relation to each other or in relation to any aggravating circumstances. Regarding the evidence presented, the court stated that the DNA analysis was credible and found Kellner's sperm on the victim in the place where she disclosed Kellner touched her; Kellner admitted to something happening; and the alleged event was consistent with the Japanese video Kellner said inspired him. Further, the court noted that it could take into consideration evidence which the State declined to present to the jury— including that Kellner had "websites of little kids dressed up in ballet outfits or Halloween costumes or nurse's costumes, and things of that nature."

The court stated that "[w]hether it happens once or twice or twenty or a hundred times, you don't get a pass from molesting a child because it only happened once." In assessing the mitigating circumstances Kellner presented, the court noted his lack of criminal history and allegation that he was under "extreme stress." The district court recognized that in the interrogation, Kellner spent a lot of time complaining to the officer "about how hard your life was, and how unfair things were for you, and things of that

41

nature. None rise to the level of excusing the behavior in which you were convicted of here." Regarding Kellner's argument to preserve the family, the district court stated that it understood but it "did not get the impression that the family wishes to—has that same wish with you as part of it."

After considering the mitigating circumstances, the court found that there were "no substantial and compelling reasons to depart from the mandatory sentence in this case." The district court sentenced Kellner to a term of imprisonment for life, with a mandatory minimum term of 25 years; lifetime sex offender registration; and lifetime parole with electronic monitoring. On appeal, this court must determine whether the sentencing court abused its discretion in declining to depart, and Kellner bears the burden of demonstrating such abuse of discretion. *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018). "A district court abuses its discretion when: (1) a ruling is based on an error of law; (2) a ruling is based on an error of fact, . . . or (3) a ruling is arbitrary, fanciful, or unreasonable." *State v. Powell*, 308 Kan. 895, 902, 425 P.3d 309 (2018).

When an adult defendant is convicted of aggravated indecent liberties with a child, they "shall be sentenced to a term of imprisonment for life with a mandatory minimum term of imprisonment of not less than 25 years . . . ." K.S.A. 2022 Supp. 21-6627(a)(1). However, for first time offenders, the court may depart—and give a more lenient sentence—if "the judge finds substantial and compelling reasons, following a review of mitigating circumstances . . . ." K.S.A. 2022 Supp. 21-6627(d)(1). Those "mitigating circumstances" include, but are not limited to, consideration of the defendant's lack of significant criminal history, that the defendant committed the crime while "under the influence of extreme mental or emotional disturbances," and the defendant's age at the time of the crime. K.S.A. 2022 Supp. 21-6627(d)(2)(A), (B), (F). Also see *State v. Jolly*, 301 Kan. 313, 322, 342 P.3d 935 (2015) (the plain language of the Jessica's Law sentencing statute instructs the sentencing court to conduct a review of mitigating circumstances without balancing them against any aggravating circumstances).

The district court must first review the mitigating circumstances without weighing them against any aggravating circumstance and then determine whether the mitigating factors are substantial and compelling reason to depart from the mandatory sentence. *Jolly*, 301 Kan. at 324. In this context, "[s]omething is '"substantial" if it is "real, not imagined; something with substance and not ephemeral," while the term "compelling" implies that the court is forced, by the facts of a case, to leave the status quo or go beyond what is ordinary.'" *Powell*, 308 Kan. at 914 (quoting *Jolly*, 301 Kan. at 323).

Kellner argues the district court failed to properly consider the mitigating factor of Kellner not having any prior criminal history because it stated that "[w]hether it happens once or twice or twenty or a hundred times, you don't get a pass from molesting a child because it only happened once." This mischaracterizes the court's statement, which was made in the context of explaining that the legislature requires a certain penalty for the crime of aggravated indecent liberties with a child, and that is true regardless of how many times the crime is committed. Ultimately, the district court stated that it considered Kellner's lack of criminal history, and there is no indication that it failed to consider the factor. The district court is not required to provide a detailed reason for why it determines that each factor is not substantial enough to warrant departure from the statutory sentence. See *Powell*, 308 Kan. at 908 (Explaining that although the sentencing statute requires a judge to explain the reasons for departure the "statute does not oblige a district court to state its reasons for denying a departure motion.")

Kellner claims that the district court failed to adequately consider his mental and emotional disturbance at the time he committed the crime as a mitigating factor. The sentencing court stated that it considered Kellner's assertion that the crime was committed while he was under extreme stress and that Kellner spent a great deal of time during the interrogation talking about his life and why he felt it was unfair. However, the court then stated these circumstances did not "rise to the level of excusing the behavior in which you were convicted of here." Kellner alleges that this statement demonstrates the

43

court did not "understand its responsibility to meaningfully consider mitigating circumstances." The record indicates otherwise. The district court provided extensive detail on its understanding of the process it was required to follow in sentencing Kellner, specifically avoided inappropriately weighing any potential "aggravating circumstances," and stated why it was denying his motion for departure.

Lastly, Kellner argued that the degree of harm caused in this case was less than usually associated with a crime of this nature. He argues the incident with the victim was brief and she hardly remembered it; there was no evidence Kellner planned the encounter; he did not force the victim to do anything; he did not threaten victim or injure her; and did not hold her down and penetrate her vagina with anything including his penis. The victim testified clearly to the details of the assault, and her impact statement and the mother's statements at sentencing show Kellner's assault will have a lifetime impact on the victim. Kellner is right that the district court provided no specific comment as to this asserted mitigating factor, but it did state that it considered Kellner's motion and oral argument which meets the requirements when denying a departure motion. See *Powell*, 308 Kan. at 908-09.

The district court explained its reasoning and analysis in denying Kellner's motion for departure. It appears to have considered each of the argued mitigating factors and did not inappropriately weigh "aggravating circumstances." The court's finding was not based on an error of law or fact, and it was not arbitrary, fanciful, or unreasonable. While some people or courts may have found Kellner's lack of criminal history and the facts of this assault warranted departure, this court cannot say that no reasonable person could take the view adopted by the district court. See *Powell*, 308 Kan. at 902. "[E]ven though mitigating circumstances must be present for a finding of substantial and compelling reasons, mitigating circumstances do not necessarily equal substantial and compelling reasons" to depart. *Jolly*, 301 Kan. at 323. The district court did not abuse its discretion in denying Kellner's motion for durational and dispositional departure.

44

Kellner was convicted of aggravated indecent liberties with a child, a heinous crime against a young victim that affected the life of multiple people. Kellner waived his rights under *Miranda*, voluntarily made inculpatory statements during interrogation, and was responsible for nearly all pretrial delays. The evidence supporting his conviction was strong, and although some errors occurred during the trial, none of those individually or cumulatively warrant reversal. Further, the district court did not abuse its discretion in denying Kellner's motion for dispositional or durational departure. A jury convicted Kellner of a serious crime, based in part on Kellner's own admissions, and the district court being in the best position to know all the facts and impact sentenced him accordingly. Finding no reversible error, this court affirms.

Affirmed.